[Cite as *Taylor v. Taylor*, 2012-Ohio-6190.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI   COUNTY

| | | |
|---|---|---|
| AARON D. TAYLOR | : | |
| | : | Appellate Case No. 2012-CA-14 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 11-DV-293 |
| v. | : | |
| | : | |
| CATHERINE TAYLOR | : | (Civil Appeal from Common Pleas |
| | : | Court, Domestic Relations) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of December, 2012.

. . . . . . . . . .

AARON D. TAYLOR, 211 West Dow Street, Tipp City, Ohio 45371
        Plaintiff-Appellee, *pro se*

JEREMY M. TOMB, Atty. Reg. #0079664, Klein, Tomb & Eberly, LLP, 124 West Main
street, Troy, Ohio 45373
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}    Respondent-appellant Catherine Taylor appeals from the trial court's order

granting a civil stalking protection order to her son, Aaron D. Taylor, and his wife and two

children. Catherine[1] contends that the evidence submitted to the trial court was insufficient to establish the necessary elements of R.C. 2903.211 by a preponderance of the evidence. Catherine further contends that the scope and duration of the protection order are unreasonable.

{¶ 2}  We conclude that the trial court's order is supported by sufficient evidence and does not constitute an abuse of discretion. Accordingly, the judgment of the trial court is Affirmed.

## I.  Catherine Engages In a Pattern of Harassment

{¶ 3}  Catherine lives in Illinois. Aaron lives in Tipp City, with his wife and two young children. Aaron and his mother have had a troubled relationship over the years. Indeed, Aaron moved twice over the past decade to be further away from Catherine.

{¶ 4}  Between 2006 and 2010, Catherine sent a number of emails to Aaron. The emails typically inquired about how things were going with Aaron and requested Aaron to call her. Catherine often expressed frustration and confusion regarding why Aaron would not involve her in his life. Aaron responded to some of Catherine's emails. His responses often exhibited frustration with his mother, and he reiterated over and over that he would not call her.

{¶ 5}  What is clear from a review of the email exchanges is that Aaron and Catherine had a dysfunctional mother-son relationship. Both parties made statements in those emails showing disdain for past actions of the other. Aaron repeatedly asked Catherine to not

---

[1] For purposes of clarity and convenience, the parties will be referred to by their first names.

call him and to limit any contact with him to the email medium. Finally, in a May 9, 2010 email to his mother, Aaron stated:

> After years of "reading" your emails, and trying to get through that I'm simply done. I give up. You are now relegated to my spam folder so as to save me the trouble of reading your crap. Have a great life. If you try to contact me again in any other form, I WILL file a harassment suite [sic].

{¶ 6} Catherine sent six more emails to Aaron from October 2010 through September 2011. At some point in 2011, Catherine drove five hours from her home in Illinois to Tipp City to see where Aaron lived. She also visited a church in Tipp City where Aaron is a youth music pastor. She spoke with some of the parishioners about Aaron, but she did not let Aaron know that she was there. Later that year, on November 20, 2011, Catherine again drove to Aaron's church in Tipp City. Catherine went to the room in the church where Aaron's oldest child was participating in a children's program. Aaron saw his mother standing about five feet from his oldest child and asked her to leave, but she refused. Aaron immediately took his wife and two children and left the church. He then filed a complaint with the Tipp City Police Department.

{¶ 7} Aaron sought an ex parte civil stalking protection order against his mother, which was granted. The matter was scheduled for full evidentiary hearing. At the evidentiary hearing, Aaron explained how his mother has stalked him:

> MR. TAYLOR: I have moved two states away, and every time that she has found out where I live, I get phone calls, emails. When she showed up more than once at my church, that becomes a pattern. When it was just me, I

didn't mind getting yelled at and told I was a bad person, whatever. I, I don't care about me, but now I'm a husband and now I'm a father. I have two children under the age of five. They do not understand stranger danger. I do not want her near them because I know what she's capable of because I watched her stalk my father. She would take me in the car as a child and we would sit a block away from his house and see if he came home when he said he was coming home. I know her pattern of behavior. I have watched it my entire childhood. I will not allow it if, if, if at all possible. It has caused my family major distress; major mental distress. We have moved, we have changed our numbers; I have cut off friendships so she could not gather information from those friends. I do not know what else I can do to communicate to her that I want nothing to do with her, other than ask the Court to protect my family for me and to give me the maximum amount of Court ordered protection, which is five years. By then my son will be ten, and we can look at this again. And for right now that's – that's all I have to say.

I do have six years worth of emails asking her to cease and desist and leave us alone and stop emailing, stop trying to contact us. Tr. 10-11.

**{¶ 8}** Aaron further explained the effect his mother's actions have had on his family:

MR. TAYLOR: I was working in the children's program. She was in the children's program, five feet away from my son. Okay. After ten years of asking her to cease and desist, and I have emails to back them up, after ten years of asking her to leave us alone, after ten years of moving two states away

twice and intentionally withholding my address from friends, removing relationships, altering my pattern of behavior, she has caused me mental distress. I have not eaten in three days. Every time that we go through a pattern like this, which does happen when she finds out where I live, my wife is stressed. She has missed work over it. She has affected my in-laws when I cut her off so she had no way to contact me. * * * Tr. 6.

{¶ 9} Catherine and the head pastor from Aaron's church also testified at the hearing. The head pastor testified that he had met with Aaron's wife to discuss Catherine's actions. According to the head pastor, Aaron's wife was afraid for her and for her children. Based on the testimony and evidence submitted by the parties, the magistrate found, in part:

[Petitioner] testified that Respondent's conduct fits a pattern: she finds him then begins yelling and harassment. He testified that this is the same pattern she engaged in with his father. He testified that he moved two states away in order to avoid Respondent. He testified due to Respondent's actions he has not been eating and that Nicki, his wife has missed work. Pastor Glover stated that Nicki is scared and afraid for the children and he senses Petitioner sees Respondent as a threat.

Respondent may not understand why Petitioner feels as he does and she may want to reach reconciliation with him, but her actions culminating with the unannounced visit in November have only deepened his mistrust and caused him and his family mental distress. Regardless of her purpose, given Petitioner's statements and acts to stop contact, the Court finds that Respondent

was aware that her continuing efforts would probably result in anguish and anxiety for Petitioner and his family.   Dkt. 9, p. 3-4.

**{¶ 10}**   The magistrate concluded that Aaron had proven that he and his family are entitled to a civil stalking protection order against Catherine for a period of five years. Catherine filed objections to the magistrate's decision, which the trial court overruled.   The trial court granted Aaron's request for a civil stalking protection order for a period of five years, protecting him and his family from his mother.   From this order, Catherine appeals.

## II. The Preponderance of the Evidence Establishes

## that Catherine Engaged in Menacing by Stalking

**{¶ 11}**   Catherine's First Assignment of Error states:

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ADOPTED THE MAGISTRATE'S DECISION GRANTING A PROTECTION ORDER WHEN THE EVIDENCE PRESENTED WAS NOT SUFFICIENT.

**{¶ 12}**   When assessing whether a civil stalking protection order should have been issued pursuant to R.C. 2903.214, the reviewing court must determine whether the petitioner proved by a preponderance of the evidence that the respondent engaged in conduct constituting menacing by stalking.   *Lane v. Brewster,* 12th Dist. Clermont No. CA2011–08–060, 2012–Ohio–1290, ¶ 50; *Olenik v. Huff,* 5th Dist. Ashland No. 02–COA–058, 2003–Ohio–4621, ¶ 16–18.   Whether the evidence presented is legally sufficient to sustain a verdict is a question of law.   *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 13}   Menacing by stalking is defined as "engaging in a pattern of conduct" that knowingly "cause[s] another to believe that the offender will cause serious physical harm to the other person or cause mental distress to the other person." R.C. 2903.211(A)(1). To establish a pattern of conduct, there only needs to be two or more actions closely related in time. R.C. 2903.211(D)(1). In determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly threatening. *Middletown v. Jones*, 167 Ohio App.3d 679, 2006–Ohio–3465, 856 N.E.2d 1003, ¶ 10 (12th Dist.) (Citations omitted.)

{¶ 14}   "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 15}   "Mental distress" is defined in R.C. 2903.211(D)(2) as any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services. * * *

{¶ 16}   "Mental distress need not be incapacitating or debilitating." *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422, ¶ 19. It is the duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions.

*Middletown* at ¶ 7. In making this determination, the trial court "may rely on its knowledge and experience in determining whether mental distress has been caused." *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005–Ohio–3498, 832 N.E.2d 757, ¶ 18 (4th Dist.) (Citations omitted.)

**{¶ 17}** Catherine contends that Aaron failed to show a pattern of conduct by her, or that she knowingly caused Aaron to believe that she would cause serious physical harm or cause mental distress to Aaron. We do not agree.

**{¶ 18}** Aaron testified about, and submitted to the court copies of, emails he had received from Catherine. The emails support Aaron's testimony that he had a troubled relationship with his mother. The emails and Aaron's testimony are sufficient to establish that his mother's actions constituted a pattern of activity that caused him mental distress, and that she knew that her actions would cause Aaron mental distress. Furthermore, Aaron's testimony, along with the testimony of the head pastor, establishes that Catherine's actions have caused Aaron's wife to suffer mental distress.

**{¶ 19}** Catherine contends that she has continued to contact Aaron in a non-threatening way to let him know that the door is still open to re-establish a mother-son relationship. But the evidence in the record establishes that Catherine has gone beyond benign contact. Aaron made it clear to his mother that he did not want any further contact with her and that he would seek a protection order if she continued to pursue contact. Despite this, Catherine sent six more emails over the course of a year and made two uninvited trips to the church where Aaron worked. This conduct by Catherine constitutes menacing by stalking.

**{¶ 20}** The trial court credited the testimony of Aaron and the head pastor of his

church where that testimony conflicted with Catherine's. The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. In *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997), we observed:

[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶ 21} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 22} The testimony of Aaron and the head pastor at his church, along with the emails sent by Catherine to Aaron, are sufficient evidence to support the trial court's decision to grant the petition for a civil protection order.

{¶ 23} Catherine's First Assignment of Error is overruled.

### III. The Scope of the Protection Order Does Not Constitute an Abuse of Discretion

{¶ 24} Catherine's Second Assignment of Error states:

SHOULD THE CSPO STAND, THE RESTRICTIONS WERE AN

ABUSE OF DISCRETION AND THE CSPO SHOULD BE AMENDED.

**{¶ 25}** A civil stalking protection order issued under R.C. 2903.214 is valid until a date certain, but not for more than five years. R.C. 2903.214(E)(2)(a). "The duration of a civil stalking protection order is within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the decision was arbitrary, unconscionable or unreasonable." *Jenkins v. Jenkins*, 10th Dist. Franklin No. 06AP-652, 2007-Ohio-422, ¶ 10 (Citation omitted.)

**{¶ 26}** Catherine contends that the trial court abused its discretion by making the duration of the protection order five years, and by including Aaron's family within the scope of the protection order. We do not agree.

**{¶ 27}** The evidence in the record established that Catherine has ignored her son's repeated requests to leave him and his family alone. Not only did she continue to email him after he warned her that he would seek legal action if she did so, but she then made two long, uninvited drives to Aaron's church. Catherine's actions have become more desperate as time has passed. Aaron and his wife are distressed by Catherine's pattern of conduct. Under the particular facts presented to the trial court in this case, we conclude the trial court did not abuse its discretion by shaping the civil stalking protection order to cover Aaron and his family for a period of five years.

**{¶ 28}** Catherine's Second Assignment of Error is overruled.

### IV.  Conclusion

**{¶ 29}** Catherine's assignments of error having been overruled, the judgment of the

trial court is Affirmed.

· · · · · · · · · · · · ·

FROELICH and HALL, JJ., concur.

Copies mailed to:

Aaron D. Taylor
Jeremy M. Tomb
Hon. Christopher Gee