**HOWARD, Appellant,**

v.

**WILSON, Appellee.**

[Cite as *Howard v. Wilson,* 186 Ohio App.3d 521, 2010-Ohio-1125.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23501.

Decided March 19, 2010.

Joseph P. Moore and David J. Caldwell, for appellant.

Frank J. Patrizio, for appellee.

---

DONOVAN, Presiding Judge.

{¶ 1} This matter is before the court on the notice of appeal of Roy Howard, filed June 18, 2009. Howard appeals from the trial court's adoption of a magistrate's decision denying his petition for a civil protection order.

{¶ 2} Howard sought the protection order in October 2008 against Kevin Wilson. Howard is married to Wilson's ex-wife, Cassandra Howard, and they live in West Carrollton. Kevin Wilson and Cassandra had a son and daughter while married, and the children live with the Howards. Wilson has visitation rights,

and he lives in Tipp City. Howard's petition states, "[Wilson] has threatened to hurt me in the past. Every time [Wilson] picks up his children from my residence to exercise visitation with the children, he drives up and down the road honking his horn at my residence. He has made multiple telephone calls to the police with false allegations of mistreatment of the children. On September 29, 2008 [Wilson] called the police and falsely alleged that the children were missing. Upon investigation, the police found that the children were safe at school in their classrooms. He watches our home and had admitted to video taping our home. He admits that he follows me and my wife and has accurately described where we've been."

{¶ 3} Following an ex parte hearing, the magistrate granted Howard's petition and issued a temporary order of protection. The matter was set for a full hearing that occurred on December 3, 2008, and February 2, 2009. Thereafter, the magistrate vacated its previous order and denied Howard's petition and dismissed the request for a civil protection order. Howard filed timely objections.

{¶ 4} In adopting the magistrate's decision, the trial court determined "that the evidence introduced by [Howard] is not sufficient to show two or more incidents, which were closely related in time, in which [Wilson] made precise threats or took action to make Howard reasonably believe he was in danger of harm. * * * [Wilson's] actions all have a reasonable explanation, and do not reasonably demonstrate intent by [Wilson] to harm or intimidate [Howard]. While it would be ideal that [Howard] and [Wilson] have a cordial and civilized relationship, given that [Howard] resides in the home of [Wilson's] former wife and child[ren], such is often not the case where blended families are involved. However, [neither] the parties' lack of warm and congenial interactions, nor the apparent friction between them over their past and present connubial relationships, necessarily rises to the level of conduct sufficient to legally support a request for a civil stalking protection order." After determining that Howard failed to show by a preponderance of the evidence that Wilson's conduct constituted menacing by stalking, the trial court adopted the magistrate's decision, denied Howard's petition and vacated the ex parte order issued against Wilson.

{¶ 5} Howard asserts one assignment of error, as follows:

{¶ 6} "The trial court abused its discretion by issuing a judgment entry adopting the decision of the magistrate that denied petitioner/appellant's request for a civil protection order where the magistrate's decision was against the manifest weight of the evidence."

{¶ 7} "Initially, it should be noted that in accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions

contained in the magistrate's report and enter its own judgment. *Dayton v. Whiting* (1996), 110 Ohio App.3d 115, 118[, 673 N.E.2d 671]. Thus, the trial court's standard of review of a magistrate's decision is de novo.

{¶ 8} "An 'abuse of discretion' standard, however, is the appellate standard of review when reviewing a trial court's adoption of a magistrate's decision. Claims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings or proposed decision. When an appellate court reviews a trial court's adoption of a magistrate's report for an abuse of discretion, such a determination will only be reversed where it appears that the trial court's actions were arbitrary or unreasonable. *Proctor v. Proctor* (1988), 48 Ohio App.3d 55, 60–61[, 548 N.E.2d 287]. Presumptions of validity and deference to a trial court as an independent fact-finder are embodied in the abuse of discretion standard. *Whiting,* supra.

{¶ 9} "An abuse of discretion means more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219[, 5 OBR 481, 450 N.E.2d 1140]. When applying the abuse of discretion standard, an appellate court may not merely substitute its judgment for that of the trial court. *Berk v. Mat[t]hews* (1990), 53 Ohio St.3d 161[, 559 N.E.2d 1301]." *Randall v. Randall,* Darke App. No. 1739, 2009-Ohio-2070, 2009 WL 1175075, ¶ 8–10.

{¶ 10} R.C. 2903.214(C)(1) allows a person to file a petition, seeking injunctive relief against another person who has allegedly engaged in a violation of R.C. 2903.211 with respect to the petitioner. R.C. 2903.211(A)(1) prohibits menacing by stalking and provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." R.C. 2903.211 was "not enacted for the purpose of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of physical danger." *Kramer v. Kramer,* Seneca App. No. 13–02–03, 2002-Ohio-4383, 2002 WL 1967104, ¶ 17.

{¶ 11} As the trial court noted, "[u]nlike the domestic violence protection order statute that requires the occurrence of only one qualifying incident of conduct, the Menacing by Stalking statute requires a 'pattern of conduct.'" "'Pattern of conduct' means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(C)(1). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "'Mental distress' means 'any mental illness or condition that involves some temporary substantial incapacity * * * or any mental illness or

condition that would normally require \* \* \* treatment \* \* \* whether or not' treatment is sought. R.C. 2903.211(D)(2). 'Mental distress need not be incapacitating or debilitating \* \* \* [and] expert testimony is not required to find mental distress.' 'A trial court is permitted to rely on its knowledge and experience in determining whether mental distress has been caused.'

{¶ 12} "The culpable mental state of menacing by stalking is 'knowingly,' which is defined in R.C. 2901.22(B) as follows: 'A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.'

{¶ 13} "Thus, in order to merit a civil protection order, the petitioner need not prove that the respondent intended to cause actual harm to the other person; instead, the evidence must show that the respondent knowingly engaged in a pattern of conduct that caused the other person to believe that the respondent will cause physical harm or that caused mental distress to the other person." (Citations omitted.) *Walker v. Edgington,* Clark App. No. 07–CA–75, 2008-Ohio-3478, 2008 WL 2699430, ¶ 21–23.

{¶ 14} At the hearing, the video transcript of which was reviewed by the trial court, Howard alleged that Wilson engaged in a series of acts against him to intentionally harass him. Howard stated that Wilson videotaped his home, entered his property and placed information regarding depression addressed to Howard's wife in his mailbox, repeatedly drove by Howard's home honking the horn of his car, called the police to Howard's home without reason, and placed Mrs. Howard's and Wilson's son in Howard's van under dangerous circumstances in heavy traffic. Howard further stated that Wilson often arrived 30 to 40 minutes early to his scheduled visitation, parking and waiting outside Howard's home. In one incident, Howard alleged that Wilson "was in my face, taunting me, wanting me to fight him, and basically he kind of threatened to kick my butt." Howard stated that Wilson's behavior "concerns [him] greatly." He further stated that Wilson's daughter had relayed a threat from Wilson to Howard. Wilson denied following Howard and his wife.

{¶ 15} On cross-examination, Howard stated, "Kevin calling the police is not a threat. Police is not a threat to me. Him calling the police is not a threat. Me having the police out at my house practically every time he comes out, I mean, my neighbors are wondering if we probably run a crack house. They haven't said that, I'm assuming that's what they're thinking." Howard also stated that he does not "pay a whole lot of attention to [Wilson] while he is in his vehicle" when Wilson arrives early, and that he had not spoken to Wilson in months.

{¶ 16} Wilson testified that his daughter told him that cameras had been installed in Howard's home, invading her privacy, and Wilson called the police to investigate the claim. Further, Wilson denied telling the police that the children were missing. In another incident, Wilson testified that he arrived at Howard's home to pick up his daughter and Howard came outside and ignored him when he asked for his daughter. A verbal altercation ensued requiring the police. Wilson stated that he calls the police to document the exchange of the children and the fact that visitation with his son is repeatedly denied. Wilson also stated that he suffers from a congenital condition known as tethered spinal injury and that he is at risk of paralysis. He is on Social Security Disability and is physically unable to fight and walks with a cane.

{¶ 17} Wilson admitted videotaping a shed on Howard's property due to his concern about its condition and the potential danger he believed it posed to his son. Wilson and his mother, Susan Wilson, testified that they often travel together to Howard's home for parenting time, and that they run errands in the course of the trip and often have extra time before the visitation period begins, and so they wait in their car, reading books or magazines.

{¶ 18} Regarding the return of Wilson's son in traffic, Wilson testified as follows: "We were at Meijer's and [my son] was in one of his foul moods and started throwing a fit inside Meijer's and wanted to go to his mom. I said, that's fine, I'll take you there. So Meijer's is approximately five minutes from their house. I got in the van. I called Cassandra. I says, [our son] wants to come home. You've told him 24/7 you'll take him anytime he wants to come home. I said I'm bringing him to you. Oh, no. Oh, no. We have plans. I said well I'm bringing him to you right now. He's beating himself in the head throwing a fit. So I pull—I get to their house. As I get to their house, [Howard] speeds out of the driveway. Goes around the block. I come back around the block. He parks in the side street next to their house. I park behind him. [My son] gets out with his bag, gets up to the van to get ready to get in. He burns rubber and speeds off. His tires go rrrrrr. He's gone.

{¶ 19} " * * * I just followed him at the railroad track, pull up next to him. * * * traffic was stopped, the train was there. I get out and open the door. * * * I will not touch their van.

{¶ 20} " * * * They open their door. [My son's] screaming and he gets in the van."

{¶ 21} Wilson's 14–year–old daughter testified that she never heard her father threaten Howard, and she stated that when he honks his horn and waves it is not meant to be harassing but merely a way of saying goodbye.

{¶ 22} We find no abuse of discretion.  The evidence presented in support of the protection order does not establish that Wilson knowingly engaged in a pattern of conduct that caused Howard to believe that Wilson would physically harm him or cause him mental distress.  The evidence shows that Wilson acted out of concern for his children and not to menace Howard by stalking him.  In other words, as the trial court noted, Wilson's behavior has a logical explanation.  Wilson alerted the police after his daughter told him about cameras being installed in the home, and he contacted the police for their support and to make a record of the visitation exchanges.  Howard indicated the calls to police are "not a threat to me."  Regarding Howard's concerns about Wilson waiting in his car outside his home for over 30 minutes, Howard indicated he did not pay attention to him, belying his claim that he felt threatened by his presence.  Howard further indicated that he had not spoken with Wilson for months, and Wilson's physical condition belies Howard's assertion that he tried to taunt Howard into a fight, as found by the lower court.

{¶ 23} Since the trial court did not abuse its discretion in adopting the magistrate's decision, the judgment of the trial court is affirmed.

Judgment affirmed.

Brogan and Froelich, JJ., concur.