[Cite as *Sweet v. Hunt*, 2014-Ohio-631.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY

| | | |
|---|---|---|
| DIANA L. SWEET | : | |
| | : | Appellate Case No. 2013-CA-37 |
| Petitioner-Appellee | : | |
| | : | Trial Court Case No. 13-SP-12 |
| v. | : | |
| | : | |
| DALE R. HUNT | : | (Civil Appeal from Common Pleas |
| | : | Court, Domestic Relations) |
| Respondent-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of February, 2014.

. . . . . . . . . . .

JENNIFER E. MARIETTA, Atty. Reg. #0089642, 77 West Main Street, Xenia, Ohio 45385
        Attorney for Petitioner-Appellee

JOSEPH W. STADNICAR, Atty. Reg. #0046851, and JUSTIN M. McMULLEN, Atty. Reg.
#0088217, 3636 Dayton-Xenia Road, Beavercreek, Ohio 45432
        Attorneys for Respondent-Appellant

. . . . . . . . . . . .

HALL, J.,

{¶ 1}     Dale R. Hunt appeals from the trial court's issuance of a civil-stalking protection

order (CSPO) against him.

{¶ 2}     Hunt advances two assignments of error. First, he contends the trial court erred in denying his motions for a continuance of a CSPO hearing. Second, he claims the evidence does not support the trial court's issuance of a CSPO.

{¶ 3}     The record reflects that appellee Diana Sweet petitioned for a CSPO on February 7, 2013. (Doc. #1). The petition alleged that Hunt had engaged in conduct constituting menacing by stalking. The conduct involved Hunt contacting her against her will after they quit dating and making statements that scared her and caused her to question his stability. (*Id*.). During an ex parte hearing, Sweet testified that Hunt's conduct made her "very nervous" and "afraid." (Ex Parte Hearing Tr. at 5). The trial court issued an ex parte CSPO the same day she filed her petition. The ex parte order scheduled a February 14, 2013  full hearing on Sweet's petition. (Doc. #6).

{¶ 4}     On February 13, 2013, Hunt moved to continue the hearing scheduled for the following day on the grounds that he only recently had retained counsel. (Doc.#15). The trial court sustained the motion and rescheduled the hearing for March 1, 2013. (Doc. #16). On February 20, 2013, the trial court sustained a discovery motion filed by Hunt and continued the hearing until April 18, 2013. (Doc. #19). On April 17, 2013, Hunt moved to continue the hearing scheduled for the following day. (Doc. #24). The basis for the motion was that related criminal charges were pending against Hunt and that a jury trial in the criminal case was scheduled for April 25, 2013. Although Hunt's motion did not explicitly say so, his concern appears to have been that testimony in the CSPO could be used against him in the upcoming criminal trial. The trial court sustained the motion and rescheduled the hearing for May 28, 2013. (Doc. #25). Its entry noted that no additional continuances would be granted. Due to a "scheduling error," however, the trial court subsequently continued the CSPO hearing until May 31, 2013. (Doc.

#28).

{¶ 5} On May 16, 2013, Hunt moved to continue the hearing again. The basis for the motion was that his related criminal charges remained pending and that his criminal trial had been rescheduled for June 13, 2013. (Doc. #29). The trial court denied this motion. (Doc. #31). On May 23, 2013, Hunt again moved for a continuance, claiming he had a previously scheduled appointment at the Cleveland Clinic. (Doc. #32). Attached to the motion was an unauthenticated May 16, 2013 print out of what appeared to be a scheduled appointment at the Cleveland Clinic. The trial court denied this motion the same day, finding it "not well taken[.]" (Doc. #33).

{¶ 6} The May 31, 2013 hearing proceeded as scheduled, and Hunt appeared for it. At the outset, Hunt's counsel orally requested a continuance, citing the existence of the pending criminal case. The trial court denied the motion. It explained: "May 14th you requested a continuance that we denied, and I am, in fact, going to deny this one, also. We need to have this hearing. This is not a criminal matter. In this case your client can choose to testify or choose not to testify, and I assume you have spoken to him about the ramifications of testifying?" (Full Hearing Tr. at 3). Hunt's counsel responded affirmatively, and only Sweet subsequently testified.

{¶ 7} After the hearing, the trial court issued a CSPO that restricted Hunt's ability to be near Sweet or to communicate with her. (Doc. #37). In support, it found that "the Respondent has knowingly engaged in a pattern of conduct that caused Petitioner to believe that the Respondent will cause physical harm or cause or has caused mental distress[.]" The trial court also found that its order was "equitable, fair, and necessary to protect" Sweet from stalking offenses. This appeal followed.

{¶ 8} In his first assignment of error, Hunt challenges the trial court's denial of his

continuance motions. He argues that the denial of the motion based on the pending criminal case denied him a meaningful opportunity to defend himself. He maintains that he could not testify because doing so would have waived his Fifth Amendment right against self-incrimination. He claims that the criminal charges subsequently were dismissed and that he will be able to testify at a new hearing on remand. He also contends granting a continuance would not have prejudiced Sweet.

{¶ 9} We review the trial court's denial of a continuance for an abuse of discretion. *In re M.H.*, 2d Dist. Montgomery No. 25084, 2012-Ohio-5216, ¶ 31. The phrase "abuse of discretion" suggests an attitude that is unreasonable, arbitrary or unconscionable. *Id.* "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.*

{¶ 10} We see no abuse of discretion here. Under R.C. 2903.214(D)(2)(a), a full CSPO hearing is to be held "within ten court days" of the issuance of an ex parte order. The statute authorizes a continuance for specified reasons. The only one potentially applicable is "for other good cause." R.C. 2903.214(D)(2)(a)(iv). As noted above, the trial court continued the CSPO hearing several times. The trial court specifically granted one continuance due to Hunt's pending criminal case. When it denied another continuance due to the pending criminal matter, the trial court had no way of knowing when the charges would be resolved because Hunt had waived a speedy trial. Ultimately, more than 100 days elapsed between the trial court's issuance of the ex parte order and the full CSPO hearing. Under these circumstances, we see no abuse of discretion in the trial court's denial of another continuance.

{¶ 11} Hunt's argument about the Fifth Amendment and the denial of his right to defend

himself fails to persuade us otherwise. "[T]he Fifth Amendment protection against compulsory, self-incriminating testimony does not extend to prohibit civil litigation while the possibility of criminal prosecution exists." *Walker v. State Medical Bd. of Ohio*, 10th Dist. Franklin No. 01AP-791, 2002-Ohio-682, 2002 WL 243318 at *4; *see also State ex rel. Verhovec v. Mascio*, 81 Ohio St.3d 334, 336, 691 N.E.2d 282 (1998). In *Wirtz v. Wirtz*, 7th Dist., Mahoning No. 99-CA-57, 2000 WL 1486652 (Sept. 27, 2000), the Seventh District rejected an argument nearly identical to Hunt's, finding no abuse of discretion in the denial of a motion to continue a CSPO hearing while related criminal charges were pending. We reach the same conclusion here. The Fifth Amendment does not shield a party from appearing or defending in a civil action. *Tedeschi v. Grover*, 39 Ohio App.3d 109, 111, 529 N.E.2d 480, 482 (10th Dist.1988). "Accordingly, [a] defendant may not interpose whatever Fifth Amendment privilege he may enjoy as a witness to obtain a continuation of the litigation." *Id.* "[M]erely because [a] defendant [may have] felt required to appear and defend does not, of itself, violate any Fifth Amendment guarantee." *Id.* Therefore, the first assignment of error is overruled.

{¶ 12}　In his second assignment of error, Hunt claims Sweet failed to prove that he engaged in menacing by stalking. Specifically, he contends she presented insufficient evidence that she feared he would cause her physical harm or that he caused her mental distress.

{¶ 13}　To grant a CSPO, the trial court was required to find, by a preponderance of the evidence, that Hunt had violated R.C. 2903.211(A)(1), which provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." A "pattern of conduct" requires two or more actions closely related in time. R.C. 2903.211(D)(1). "In

determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly threatening." *Lewis v. Jacobs*, 2d Dist. Montgomery No. 25566, 2013-Ohio-3461, ¶ 10. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "Mental distress" means a mental illness or condition "that involves some temporary substantial incapacity" or "that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2).

{¶ 14} The mental distress required for a menacing-by-stalking violation need not always be incapacitating or debilitating. *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-14, 2012-Ohio-6190, ¶ 16; *see also Howard v. Wilson*, 186 Ohio App.3d 521, 2010-Ohio-1125, 928 N.E.2d 1180, ¶ 11 (2d Dist.). "It is the duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Id.* "In making this determination, the trial court 'may rely on its knowledge and experience in determining whether mental distress has been caused.'" *Id.*, quoting *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 18 (4th Dist.). This court has applied an abuse-of-discretion standard to a trial court's decision whether to grant a civil protection order. *See*, *e.g.*, *Walker v. Edgington*, 2d Dist. Clark No. 07-CA-75, 2008-Ohio-3478, ¶ 24; *Bryant v. Spear-Hardy*, 2d Dist. Montgomery No.

23449, 2010-Ohio-1903, ¶ 23.

{¶ 15}  The only witness at the CSPO hearing was Sweet. Hunt claims she failed to establish entitlement to a protection order because she admitted that he never caused or threatened physical harm and because she did not demonstrate the existence of mental distress. With regard to mental distress, Hunt contends Sweet did not testify about any substantial incapacity or condition normally requiring mental-health treatment. He further argues that she did not testify about believing his actions would continue or about making any lifestyle changes due to his behavior. He claims she did not mention fearing for her safety or being upset in her reports to the police. He characterizes her as being "merely  annoyed by a despondent ex-lover who was unprepared to let go of a terminated romantic relationship." (Appellant's brief at 8).

{¶ 16}  Upon review, we conclude that the trial court reasonably could have relied on Sweet's testimony to find, by a preponderance of the evidence, that Hunt had engaged in menacing by stalking. Sweet testified that she met Hunt while she was working at Walmart. He frequented the store as a customer, and they became friends. (Full Hearing Tr. at 5-6). A dating relationship developed in the summer of 2012. (*Id*. at 6). Sweet tried to end the relationship in January 2013, and Hunt did "a few things" that "scared" her. (*Id*. at 7). Shortly after they broke up, he "showed up at [her] doorstep" around 2:00 a.m. Sweet worked third shift and had left early that night. (*Id*.). Upon seeing Hunt at her back door, she cursed and asked what he was doing there. He responded that he wanted to talk, and she refused. (*Id*.).

{¶ 17}  Hunt showed up at Sweet's house again on February 2, 2013. (*Id*. at 8). On that occasion, he approached her back door and began peering through her window. Hunt was talking to Sweet on a cell phone at the time, and he told her he could see into her house. (*Id*.). Sweet told

Hunt to leave. He refused and indicated that he wanted to talk. (*Id.*). Sweet declined and called 911. Before the police could respond, Sweet's son arrived and told Hunt to leave. (*Id.* at 10). Hunt again refused. (*Id.*). Police then responded while Hunt was there. After speaking to the police, Hunt left. (*Id.* at 9). Minutes later, Sweet began receiving calls from Hunt's cell phone "over and over and over and over again[.]" (*Id.* at 9, 12). While receiving the calls, Sweet dialed 911 again and asked what she should do. (*Id.* at 15). After Sweet had received between ten and fifteen calls, her son answered the phone and advised Hunt to stop. (*Id.* at 14). A police officer then returned to Sweet's house. The officer called Hunt and told him again not to contact Sweet. (*Id.* at 15). The following morning, however, Hunt approached Sweet while she was working at Walmart and asked her, "Is this too close?" (*Id.* at 16). Hunt also called Sweet two more times shortly after February 2, 2013, trying to talk her into not breaking up. (*Id.* at 19-20). Sweet stated that, based on what had occurred, Hunt "scare[d]" her. (*Id.* at 23). Sweet also recalled an incident during their relationship when Hunt showed up with ropes and said he was going to tie her up. (*Id.* at 23-24). She thought this "was really a serious problem" in addition to Hunt "looking through [her] window and popping up at strange hours, trying to convince [her] to stay with him[.]" (*Id.* at 24).

{¶ 18}  On cross examination, Sweet agreed that Hunt never harmed her physically. (*Id.* at 39). When asked whether he had threatened to harm her physically, she responded that it was "more mentally." (*Id.*). With regard to the ropes she had mentioned, Sweet stated that they were not part of the parties' physical relationship and that Hunt never had tried to tie her up. (*Id.* at 41). She added, however, that she had hidden the ropes from Hunt when he went to the bathroom. (*Id.* at 41-42). Sweet then acknowledged that she had not seen any doctor, psychiatrist, or

psychologist as a result of Hunt's actions. (*Id*. at 45). She did testify, however, about becoming "very emotionally upset" because Hunt "would not take no for an answer" after she terminated the relationship. (*Id*. at 32). At one point in her testimony, the trial judge interrupted the proceedings and stated: "Knock it off, Mr. Hunt. Just let the record reflect that he was staring down the witness from behind his attorney." (*Id*. at 45). Hunt denied the judge's observation. (*Id*.). The judge responded: "I observed what you were doing, sir." (*Id*.).

{¶ 19} In our view, Sweet's testimony was sufficient for the trial court to find that Hunt had engaged in menacing by stalking. The trial court had the discretion to credit her testimony, which supports a finding that he engaged in a pattern of conduct that knowingly caused her mental distress. Following Sweet's termination of their relationship, he appeared at her home on more than one occasion, unannounced and uninvited. He refused to leave and insisted on talking to her. On one occasion, he arrived in the middle of the night. On another occasion, he was peering in her window. He also made numerous unwanted calls and showed up at her place of employment after being told to stay away. Hunt knew this contact was unwanted because Sweet and the police had so advised him. During the ex parte hearing, Sweet testified that Hunt made her "very nervous" and "afraid." During the full hearing, she reiterated that his conduct "scared" her and made her "emotionally upset." We believe Sweet's testimony was sufficient for the trial court to conclude, by a preponderance of the evidence, that Hunt had engaged in menacing by stalking. Accordingly, the second assignment of error is overruled.

{¶ 20} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and WELBAUM, J., concur.

Copies mailed to:

Jennifer E. Marietta
Joseph W. Stadnicar
Justin M. McMullen
Hon. Steven L. Hurley