[Cite as *Wegman v. Ashton*, 2020-Ohio-4330.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| DANIEL WEGMAN | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28582 |
| | : | |
| v. | : | Trial Court Case No. 2019-CV-145 |
| | : | |
| SARAH DEE ASHTON | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of September, 2020.

. . . . . . . . . . .

DANIEL WEGMAN, 8718 Deer Chase Drive, Dayton, Ohio 45424
        Plaintiff-Appellee, Pro Se

PAMELA L. PINCHOT, Atty. Reg. No. 0071648, 345 North Main Street, Suite 2, Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Sarah Dee Ashton appeals from the trial court's order adopting the magistrate's decision to grant Daniel Wegman's petition for a civil stalking protection order (CSPO) and overruling Ashton's objections to the magistrate's decision. The judgment of the trial court will be affirmed.

{¶ 2} Wegman filed his petition for a CSPO on January 9, 2019. On the petition form, Wegman checked box 3(a), which stated: "For a civil stalking protection order due to menacing by stalking, describe the nature and extent of the pattern of conduct that causes you to believe that Respondent will cause you physical harm or causes (or had caused) mental distress. Also describe any previous convictions of Respondent for the crime of Menacing by Stalking, if known." On the lines below, Wegman wrote: "Package arrived on 9 Jan 2019. Sarah visited my house twice on Christmas Day 2018. I didn't answer the door."

{¶ 3} The magistrate held an ex parte hearing on January 9, 2019. At the hearing, Wegman testified that he met Ashton in the late 1980s at Edwards Air Force Base in California; after he left California around 1989, he "never saw" Ashton "until she started pestering [him] * * * with email and visits and mail" about five years prior to the hearing. Wegman testified that he had previously had a protection order against Ashton for two years, but he believed it had expired "maybe two or three years ago." Wegman testified that Ashton had violated that protection order three times; on the third occasion, he "was subpoenaed by the Grand Jury to testify about her behavior." He did not know what happened after that, but he did not have to return to court.

{¶ 4} Wegman testified that, on the day of the hearing and the filing of his petition (January 9), he had received a package through certified mail at his house containing a

large box of Christmas cookies and candy, a small Bible, and a couple of cards. On New Year's Eve, Ashton had also sent him an email "to an old abandoned email address" that he occasionally checked; it just said, "Dan?" Additionally, on Christmas Day, Wegman heard his doorbell ring and "knew it had to be her because that's her * * * behavior pattern." He didn't answer the door. Later the same day, Wegman's doorbell rang again, and that he ignored it. According to Wegman, he heard a car pulling out and observed Ashton's vehicle leaving the front of his home.

{¶ 5} Wegman further testified that, on the day before Thanksgiving 2018, Ashton had stopped by his house and rang the bell. He opened the door and she was standing there. Wegman said, "What are you doing here?," and Ashton replied that she "just wanted to wish [him] a happy Thanksgiving." Wegman closed the door and watched Ashton go back to her car, and she left. Wegman also stated that, earlier in the year, he had received a package via certified mail that contained "just a simple card with [Ashton's] name and address written on it, with no other kind of message." The magistrate granted the temporary order.

{¶ 6} The full hearing occurred on March 12, 2019. At that hearing, Wegman testified that he and Ashton had "never had a social relationship" in California "or ever." When asked if he ever had contact with her when she came to his home, Wegman responded, "Only to tell her to leave * * * and not come back." Wegman presented photos of the items he had received from Ashton. He stated that he signed for a package from Ashton on May 2, 2018; it contained a silver card with Ashton's contact information. Wegman testified that on one occasion he yelled at Ashton through his door, telling her, "You need to leave." He stated that the package he received on January 9, 2019

contained a note that stated:

> Dear Dan, please find the enclosed Christmas card from 2018 and the following baked goods: two pounds chocolate fudge, two dozen Buckeyes * * *. Please accept this gift from me. We can start over or pick up where we left off or both. You may chose. You have freedom. Please do contact me. Call or text is okay or email. Thank you. I remember. Okay? At least give me permission to contact you. I can explain, though I think, by now, you may know more than you did a few years ago.
>
> Sincerely, Sarah

{¶ 7} Wegman again testified that Ashton came to his home twice on Christmas Day 2018, and he did not answer the door. Ashton also came to his door on November 21, 2018; he opened the door and asked her why she was there. Ashton said she wanted to wish him a happy Thanksgiving, and he turned around and closed the door without responding to her, because he "didn't want to talk to her." Wegman stated that Ashton was carrying something he assumed to be "cookies or something." He testified that, on March 11, 2018, when he yelled to Ashton through his door to leave, he "couldn't hear her voice" but saw her throw her hands up, and then she left.

{¶ 8} On cross-examination, Wegman acknowledged that no protection order was in place on the above dates. Wegman testified that he thought he "was being harassed" but that maybe Ashton would stop that behavior. However, when it "escalated to things being sent * * * in the mail and delivered to [his] house," he started to get nervous about what might be next. When asked if Ashton ever caused him physical harm, threatened him with physical harm, called him names, or swore at him, Wegman responded, "No. I

limited our conversation to avoid that." Wegman also testified that, although the record from the ex parte hearing indicated that he responded "Okay" to Ashton at Thanksgiving before closing the door, in fact he "didn't make a comment," but it was "essentially true that [he] ignored what she said and closed the door."

{¶ 9} After cross-examination, Ashton's attorney moved for dismissal, asserting that Wegman had "testified to no mental distress" and that the incidents he described were "certainly benign" and "wouldn't cause a normal person any degree of distress." The court took the matter under advisement.

{¶ 10} The trial court's order granting the CSPO found: "After the expiration of a prior order, respondent began engaging in the same behavior, showing up at petitioner's home, mailing him cards, letters and gifts. This transpired [between] May 2018 and Jan 2019. *See, Sweet v. Hunt*, 2014 Ohio 631* * *."

{¶ 11} On April 11, 2019, Ashton requested findings of fact and conclusions of law. On April 15, 2019, Ashton filed eight objections, and she later supplemented her objections.

{¶ 12} On July 29, 2019, the trial court overruled Ashton's request for findings of fact and conclusions of law, and on September 27, 2019, the court overruled Ashton's objections. The court "fully agree[d]" with the magistrate's conclusion that Wegman had proved by a preponderance of the evidence that Ashton had "engaged in conduct constituting menacing by stalking." The court noted that Wegman testified about multiple instances in which Ashton had appeared at his home uninvited and/or contacted him via email during 2018 and 2019. The court found that, although there were periods of time during which Ashton did not contact Wegman, "in considering the evidence in the context

of all circumstances of this matter, * * * the incidents were closely related in time," and Wegman established by a preponderance of the evidence that Ashton had engaged in "a pattern of conduct involving two or more incidents closely related in time."[1]

{¶ 13} The court further found that Ashton acted knowingly to cause Wegman mental distress. Although the court noted that it could not take judicial notice of the prior proceedings between these parties, it found that the record in this matter indicated that Wegman had previously filed a CSPO petition against Ashton, which had been resolved by a consent agreement. The court noted that Wegman testified about a prior consent order and that Ashton had violated it three times. The court concluded that, "[b]ased upon the prior filing of a CSPO petition, combined with Mr. Wegman's refusal to speak with Ms. Ashton despite her numerous attempts to communicate with him, it is clear that Ms. Ashton had an awareness that Mr. Wegman wanted no further contact with her." The court further found that Ashton's behavior appeared to have escalated over time, as she continued to appear at Wegman's home and send him letters and packages even after he told her that she needed to leave and that he did not want any further contact with her. The court cited *Taylor v. Taylor,* 2d Dist. Miami No. 2012-CA-14, 2012-Ohio-6190, ¶ 19, in support of its findings.

{¶ 14} The Court rejected Ashton's objection to the magistrate's finding that she "began engaging in the same behavior" of showing up at Wegman's home, mailing him

---

[1] In a footnote, the court addressed Ashton's assertion that Wegman had testified inconsistently: at the ex parte hearing, he testified that he said "Okay" to Ashton prior to closing the door when she wished him happy Thanksgiving, but at the final hearing he testified that he had not spoken to her at all before closing the door. The court cited Wegman's testimony about the encounter at the full hearing and determined that his testimony was "consistent."

cards, letters and gifts "[a]fter the expiration of a prior order." The court noted that the magistrate did not specifically state that the contact occurred "immediately" following the expiration of the prior order and that, although it was unclear when the prior order expired, Ashton's conduct in 2018 and 2019 clearly occurred after the expiration of the prior consent order. Thus, the court found that the magistrate's finding accurately described what had occurred and that Ashton's objection was without merit.

{¶ 15} The court continued its analysis as follows:

> Lastly, the Court finds that Mr. Wegman established by a preponderance of the evidence that Ms. Ashton knowingly acted to cause him mental distress. During the ex parte hearing, Mr. Wegman testified that Ms. Ashton began stalking him nearly five years prior and that he had previously filed a CSPO Petition and obtained a consent order limiting contact between them. * * * During the full hearing, Mr. Wegman testified that he was "harassed" by Ms. Ashton's repeated visits and that he "thought maybe she would stop that behavior. But when it escalated to things being sent to me in the mail and delivered to my house, that's when I started to get a little nervous about what might be next." * * * When asked if Ms. Ashton threatened him, called him names, or cursed at him, Mr. Wegman testified that he "limited [the] conversation to avoid that." Upon review, the Court finds that the "stress brought on by [Ashton's] repeated stalking and unwanted attention would normally require mental health services and/or psychological treatment" and thus constitutes mental distress under R.C. 2903.211(D)(2)(b). * * * Mr. Wegman is not required to show that he

received any treatment for his mental distress. * * * Given that Ms. Ashton appeared at Mr. Wegman's home on multiple occasions unannounced and uninvited, and given that her apparent escalation in behavior scared Mr. Wegman, the Court finds that Mr. Wegman's testimony was sufficient to support a finding that Ms. Ashton engaged in conduct that knowingly caused him mental distress. * * *

Therefore, Mr. Wegman demonstrated by a preponderance of the evidence that Ms. Ashton knowingly engaged in a pattern of conduct that caused him to believe that she would cause him mental distress. Pursuant to Civ.R. 65.1(F)(3)(d)(iii), Ms. Ashton has not met her burden of showing that the credible evidence of record is insufficient to support the granting of the protection order, and the Court finds that the Magistrate properly granted Mr. Wegman's CSPO Petition. * * *

{¶ 16} On appeal, Ashton asserts two assignments of error which we will consider together. (We note that Wegman did not file a responsive brief.) Ashton's assigned errors are as follows:

THE TRIAL COURT ABUSED ITS DISCRETION IN ADOPTING THE FINDING OF FACT OF THE MAGISTRATE THAT "[A]FTER THE EXPIRATION OF A PRIOR ORDER, RESPONDENT BEGAN ENGAGING IN THE SAME BEHAVIOR SHOWING UP AT THE PETITIONER'S HOME, MAILING HIM CARDS, LETTERS, AND GIFTS."

THE TRIAL COURT FURTHER ABUSED ITS DISCRETION BY GRANTING WEGMAN'S PETITION FOR CIVIL PROTECTION ORDER

BECAUSE WEGMAN DID NOT PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT ASHTON KNOWINGLY ENGAGED IN A PATTERN OF CONDUCT THAT CAUSED WEGMAN TO BELIEVE THAT ASHTON WOULD CAUSE HIM PHYSICAL HARM OR MENTAL DISTRESS.

{¶ 17} In her first assignment of error, Ashton asserts that Wegman did not prove his case by a preponderance of the evidence and therefore it was an abuse of discretion for the trial court to grant his petition. Specifically, Ashton asserts that the "expired protection order was a consent agreement" which contained no findings of fact, and therefore the magistrate erred in finding that she began engaging "in the same behavior" after the expiration of the prior order; she contends that, without a findings of facts, it was impossible for the magistrate "to legally come to that conclusion."

{¶ 18} In her second assignment of error, Ashton asserts that Wegman "did not prove [her] conduct caused him physical harm or mental distress." She argues:

According to Wegman, Ashton's conduct was limited to benign behaviors i.e. to knocking on the door of his home on March 11, 2018, sending him a card with her email address and phone number on it on May 2, 2018, visiting his home on or about Thanksgiving 2018, knocking on his door, and wishing him a happy Thanksgiving, knocking on the door twice on Christmas day 2018, but having no contact with Wegman, and sending him a package with Christmas cookies and candy and a note * * * [on January 9, 2019].

{¶ 19} According to Ashton, Wegman admitted that Ashton did not "cause him

physical harm or threaten him with physical harm," and "even though Wegman bore the burden of proof, he did not testify to any mental illness or condition that involve[d] some temporary substantial incapacity or mental illness or condition that would normally require psychiatric condition [sic] whether or not that person actually sought said treatment." Ashton argues that Wegman did not testify to any "fear, anxiety, or emotional upset from these incidents whatsoever" and did not present witnesses to testify to his mental distress; as such, the record was "simply devoid of any mention of mental distress on the part of Wegman."

{¶ 20} Ashton directs our attention to *Kinderdine v. Gilreath,* 2d Dist. Miami No. 03CA36, 2004-Ohio-868, and argues that "while the Second District does not require the mental distress to always be incapacitating or debilitating, the petitioner still must suffer some mental distress and it must be more than mere anxiety." Ashton asserts that a trial court should not "find [that] mental distress has been caused merely because the petitioner complains about the respondent's conduct."

{¶ 21} Ashton contends that this case is distinct from *Sweet v. Hunt*, 2d Dist Greene No. 2013-CA-37, 2014-Ohio-631, and *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-14, 2012-Ohio-6190, in that she and Wegman "never had a social relationship," the prior protection order was based on a consent agreement with no finding of facts, and when she appeared at Wegman's home "more than 2 years after the expiration of the consent agreement," she did not refuse to leave, peer in a window, or cause Wegman to call the police. Ashton argues that she "only asked permission to contact him." She also points out that the incidents in question "were separated by months, not days or weeks," and the CSPO statute "was never meant to forbid all benign contact between

parties that one party may not like as in this case."

{¶ 22} Ashton directs our attention to *Howard v. Wilson*, 186 Ohio App.3d 521, 2010-Ohio-1125, 928 N.E.2d 1180 (2d Dist.), and she asserts that, in that case, the respondent "had a logical explanation" and "acted out of concern for his children and not to menace the petitioner." Ashton analogizes this case, asserting her "conduct had a logical reason i.e. she wanted to renew an acquaintance to discuss an event in the past. * * * Her contact with Wegman was not a pattern and wouldn't cause anybody physical harm or mental distress." Ashton characterizes the incidents of which Wegman complained as "friendly," with "very limited interaction, if any, between the parties." Finally, Ashton argues that her actions did not constitute a pattern of conduct "as they were isolated incidents and not closely related in time."

{¶ 23} In *Sweet,* this Court noted:

To grant a CSPO, the trial court was required to find, by a preponderance of the evidence, that [respondent] violated R.C. 2903.211(A)(1), which provides: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." A "pattern of conduct" requires two or more actions closely related in time. R.C. 2903.211(D)(1). "In determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly threatening." *Lewis v. Jacobs*, 2d Dist. Montgomery No. 25566, 2013-Ohio-3461, ¶ 10. "A person acts knowingly, regardless of his

purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). * * * "Mental distress" means a mental illness or condition "that involves some temporary substantial incapacity" or "that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2).

The mental distress required for a menacing-by-stalking violation need not always be incapacitating or debilitating. *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-14, 2012-Ohio-6190, ¶ 16; *see also Howard v. Wilson*, 186 Ohio App.3d 521, 2010-Ohio-1125, 928 N.E.2d 1180, ¶ 11 (2d Dist.). "It is the duty of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's actions." *Id.* "In making this determination, the trial court 'may rely on its knowledge and experience in determining whether mental distress has been caused.' " *Id.,* quoting *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 18 (4th Dist.). This court has applied an abuse-of-discretion standard to a trial court's decision whether to grant a civil protection order. *See, e.g., Walker v. Edgington*, 2d Dist. Clark No. 07-CA-75, 2008-Ohio-3478, ¶ 24; *Bryant v. Spear-Hardy*, 2d Dist. Montgomery No. 23449, 2010-Ohio-1903, ¶ 23.

*Id.* at ¶ 13-14.

**{¶ 24}** This Court has noted:

> \* \* \* " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result."
>
> *AAAA Ents., Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

*Tax Ease Ohio LLC v. Jones*, 2d Dist. Montgomery No. 27687, 2017-Ohio-9053, ¶ 4.

**{¶ 25}** We initially note that while Ashton specifically acknowledges the prior consent decree, it is not part of our record. Consent decrees are used to resolve disputes between parties, and we can infer from its existence, along with Wegman's testimony that Ashton violated the decree three times, that Ashton has a history of unwanted contact with Wegman beyond this case. The magistrate merely noted in the factual finding that Ashton was again engaging or attempting to engage with Wegman against his wishes by means of mailing him cards, letters, and gifts, as Wegman testified. We agree with the trial court that this finding was accurate. Ashton's first assignment of error lacks merit and is overruled.

**{¶ 26}** Regarding Ashton's second assignment of error, we note that in *Sweet*,

this Court reviewed the following evidence, concluding that it was sufficient to establish that the respondent had engaged in menacing by stalking:

* * * Sweet testified that she met Hunt [the respondent] while she was working at Walmart. He frequented the store as a customer, and they became friends. (Full Hearing Tr. at 5-6). A dating relationship developed in the summer of 2012. (*Id.* at 6). Sweet tried to end the relationship in January 2013, and Hunt did "a few things" that "scared" her. (*Id.* at 7). Shortly after they broke up, he "showed up at [her] doorstep" around 2:00 a.m. Sweet worked third shift and had left early that night. (*Id.*). Upon seeing Hunt at her back door, she cursed and asked what he was doing there. He responded that he wanted to talk, and she refused. (*Id.*).

Hunt showed up at Sweet's house again on February 2, 2013. (*Id.* at 8). On that occasion, he approached her back door and began peering through her window. Hunt was talking to Sweet on a cell phone at the time, and he told her he could see into her house. (*Id.*). Sweet told Hunt to leave. He refused and indicated that he wanted to talk. (*Id.*). Sweet declined and called 911. Before the police could respond, Sweet's son arrived and told Hunt to leave. (*Id.* at 10). Hunt again refused. (*Id* .). Police then responded while Hunt was there. After speaking to the police, Hunt left. (*Id.* at 9). Minutes later, Sweet began receiving calls from Hunt's cell phone "over and over and over and over again[.]" (*Id.* at 9, 12). While receiving the calls, Sweet dialed 911 again and asked what she should do. (*Id.* at 15). After Sweet had received between ten and fifteen calls, her son answered the

phone and advised Hunt to stop. (*Id.* at 14). A police officer then returned to Sweet's house. The officer called Hunt and told him again not to contact Sweet. (*Id.* at 15). The following morning, however, Hunt approached Sweet while she was working at Walmart and asked her, "Is this too close?" (*Id.* at 16). Hunt also called Sweet two more times shortly after February 2, 2013, trying to talk her into not breaking up. (*Id.* at 19-20). Sweet stated that, based on what had occurred, Hunt "scare[d]" her. (*Id.* at 23). Sweet also recalled an incident during their relationship when Hunt showed up with ropes and said he was going to tie her up. (*Id.* at 23–24). She thought this "was really a serious problem" in addition to Hunt "looking through [her] window and popping up at strange hours, trying to convince [her] to stay with him[.]" (*Id.* at 24).

On cross examination, Sweet agreed that Hunt never harmed her physically. (*Id.* at 39). When asked whether he had threatened to harm her physically, she responded that it was "more mentally." (*Id.*). With regard to the ropes she had mentioned, Sweet stated that they were not part of the parties' physical relationship and that Hunt never had tried to tie her up. (*Id.* at 41). She added, however, that she had hidden the ropes from Hunt when he went to the bathroom. (*Id.* at 41-42). Sweet then acknowledged that she had not seen any doctor, psychiatrist, or psychologist as a result of Hunt's actions. (*Id.* at 45). She did testify, however, about becoming "very emotionally upset" because Hunt "would not take no for an answer" after she terminated the relationship. (*Id.* at 32).

*Id.* at ¶ 16-18.

**{¶ 27}** Although some of the facts differ (e.g., Ashton did not peer into Wegman's window, and Wegman did not contact law enforcement), we conclude that, as in *Sweet*, Ashton refused repeatedly to accept that Wegman wanted no contact with her. Further, as in *Taylor*, where petitioner's mother repeatedly emailed and visited petitioner over a period of years against his wishes, we conclude that Ashton's ongoing stalking of Wegman had "gone beyond benign contact." *Id.* at ¶ 19. Wegman testified that his only direct interaction with Ashton was to tell her to leave and not come back, and we find that the incidents Wegman described were not as "friendly" as Ashton asserted. We further find that under these circumstances, Ashton's appearing uninvited not once but twice on Christmas Day was especially intrusive.

**{¶ 28}** While Ashton asserts that her conduct "had a logical reason," namely for her to renew her acquaintance with Wegman, we disagree. In *Howard v. Wilson,* 186 Ohio App.3d 521, 2010-Ohio-1125, 928 N.E.2d 1180, ¶ 11 (2d Dist.), this Court concluded:

> The evidence shows that Wilson [respondent] acted out of concern for his children and not to menace Howard [petitioner] by stalking him. In other words, as the trial court noted, Wilson's behavior has a logical explanation. Wilson alerted the police after his daughter told him about cameras being installed in the home, and he contacted the police for their support and to make a record of the visitation exchanges. Howard indicated the calls to police are "not a threat to me." Regarding Howard's concerns about Wilson waiting in his car outside his home for over 30

minutes, Howard indicated he did not pay attention to him, belying his claim that he felt threatened by his presence. Howard further indicated that he had not spoken with Wilson for months, and Wilson's physical condition belies Howard's assertion that he tried to taunt Howard into a fight as found by the lower court.

*Id.* at ¶ 22.

**{¶ 29}** As early as March 11, 2018, Wegman yelled to Ashton through his door, "You need to leave," and, as the trial court determined, Ashton knew that Wegman did not want any contact with her. Far from there being a logical explanation for Ashton's conduct, Wegman testified that he was familiar with Ashton's "behavior *pattern*," that he "was being harassed" by her, that she had pestered him over time, that her behavior "escalated," and that he was alarmed about what she might do next.

**{¶ 30}** Finally, we conclude that Ashton's reliance upon *Kinderdine,* 2d Dist. Miami No. 03CA36, 2004-Ohio-868, is misplaced. In that case, a husband sought a protection order against his wife's former husband after "friction developed between Kinderdine [respondent] and the Gilreaths [petitioner and his wife] arising from issues concerning custody and visitation." *Id.* at ¶ 3. The petition was dismissed because the trial court rejected petitioner's "mental distress" claim on a finding that, notwithstanding respondent's conduct, "mental distress as R.C. 2903.211(D)(2) defines it was not shown." *Id.* at ¶ 11. Respondent's former wife testified that she had been taking the prescription drug Paxil "for several years to treat the anxieties that [respondent's] behavior had caused her." On appeal, we held that "[a]n anxiety is not a 'substantial incapacity,' and neither would it 'normally require psychiatric treatment.' " *Id.* We further noted that "[a]t most,

[respondent's actions] [were] the product of ongoing frictions and hostilities, many of them created by [petitioner] himself, which portray anger and frustration, but without the prospect that physical harm will be inflicted." *Id.* at ¶ 13.

{¶ 31} Wegman testified that he and Ashton never had a social relationship, and unlike in *Kinderdine,* there was no ongoing relationship between him and Ashton. Wegman did nothing to give rise to Ashton's unwanted attention, and we agree with the trial court that her ongoing unwanted contacts might normally require mental health services. This is especially so since Ashton had already been a party to the consent decree and violated it. Wegman did not merely "complain" about Ashton's conduct, as she suggests; he sought a second order of protection. Taking each of Ashton's actions into consideration, we conclude that a pattern of escalating conduct was demonstrated, even if the actions taken in isolation did not seem particularly threatening. As noted above, Wegman's mental distress did not have to be incapacitating or debilitating.

{¶ 32} Based upon the foregoing, we conclude that Wegman proved by a preponderance of the evidence that Ashton engaged in menacing by stalking. Since an abuse of discretion is not demonstrated, Ashton's second assignment of error is overruled.

{¶ 33} Having overruled both of Ashton's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . .

TUCKER, P.J. and FROELICH, J., concur.

Copies sent to:

Daniel Wegman
Pamela L. Pinchot
Hon. Mary L. Wiseman