[Cite as *D.F. v. Starkey*, 2026-Ohio-1298.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

D.F.,

Petitioner-Appellee,

v.

MELISSA STARKEY,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 BE 0029

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 25 DR 130

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

**JUDGMENT:**
Affirmed.

*D.F.,* pro se.

*Atty. Bonnie R. Conaway*, B. Conaway at Law, LLC, for Respondent-Appellant.

Dated: April 9, 2026

**Robb, J.**

**{¶1}** Respondent-Appellant Melissa Starkey appeals the decision of the Belmont County Common Pleas Court granting a civil stalking protection order against her as requested by Petitioner D.F. Respondent contests the sufficiency and the weight of the evidence on the elements of menacing by stalking, upon which the order of protection is based, and also contends the five-year duration of the order was an abuse of discretion. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

**{¶2}** On April 28, 2025, Petitioner filed a pro se petition for a civil stalking protection order against Respondent. The next day, the court held an ex parte hearing, issued a temporary protection order, and set the full hearing for the next week. (4/29/25 J.E.). The parties then obtained attorneys. Continuances by the defense and then Petitioner were eventually followed by a June 5, 2025 hearing.

**{¶3}** Respondent testified she knew Petitioner for approximately ten years, noting Petitioner's husband would bring Petitioner to holiday events at Respondent's house. (Tr. 6, 67). Respondent was previously married to Petitioner's husband (for 24 years), had children with him, was still friends with him, and performed some work at his business. *Id.* at 6, 66.

**{¶4}** Respondent said they had no issues until Petitioner "served Petitioner's husband with papers on Valentine's Day," "filed for divorce," and asked to be removed from the family group chat. *Id.* at 6, 9, 67. Petitioner, however, clarified she obtained but did not file dissolution papers in February 2025, after her husband had an affair, and her husband thereafter filed for divorce in May. *Id.* at 41-46.

**{¶5}** Respondent believed Petitioner started causing problems for the family such as by trying to make Petitioner's husband "look like a bad person" and "talking about" Respondent or threatening to call the IRS on her. *Id.* at 9, 67-68. In response, Petitioner testified the IRS comment was made to her own husband about him signing *her* name on their tax returns. *Id.* at 49.

Case No. 25 BE 0029

{¶6} On April 21, 2025, Respondent texted Petitioner to say, "When this is all over, I am telling the world what kind of person you really are. Hope you will be prepared for that." *Id.* at 15 (Ex. 4). Apparently following through with the warning, Respondent posted a comment on social media accusing Petitioner of failing to report an incident involving a minor many years ago, which prompted a third-party's response expressing outrage about Petitioner. *Id.* at 12-13, 73 (with the court admitting into evidence Respondent's post and the response in Ex. 2). Although this screenshotted portion of posts did not use Petitioner's name, Respondent acknowledged the conversation was about Petitioner, and the conversation shows the third-party commenter knew who was being discussed. *Id.* at 12-13. Respondent testified she did not know why this would upset anyone when it was "the truth." *Id.* at 13, 77 (the closing argument of Petitioner's counsel asked the court to remember Respondent's "vile" demeanor while testifying about this subject). Due to the sensitive nature of the post, we will not further discuss it except to note Petitioner's testimony explained the situation did not rise to a reportable level, was an extremely private matter, and was published by Respondent to inflict harm to her (and on the former minor). *Id.* at 33-34, 42-43.

{¶7} During the week before the Monday, April 28 petition was filed, Respondent learned a bar owner saw Petitioner at a store, was asked by Petitioner if he was hiring, and was contemplating hiring Petitioner as a bartender. In addition to working for her ex-husband and owning multiple businesses (with thirty employees), Respondent said she "helped" at the bar in Barton, Ohio on Thursdays (for the weekly raffle and marketing). *Id.* at 11-12, 16-17, 69. She went to high school with the bar owner, knew him for 35 years, and considered him a friend (who also came to holidays at her house). *Id.* at 16. Respondent testified she was upset the bar owner would consider hiring Petitioner and upset Petitioner would ask him for employment since Respondent not only helped at the bar and lived two miles away, but was also "there all the time." *Id.* at 16-17. She therefore went to the bar on a Friday afternoon while her stepdaughter was working and called the bar owner, who was not present at the time. *Id.* at 68.

{¶8} According to the bar owner's testimony, Respondent told him, "She can't work for you. I do not want her to work for you." When he asked why, she said Petitioner

and Petitioner's husband were getting divorced. *Id.* at 21. When he asked what that had to do with Petitioner working at the bar, Respondent made the following statements:

> It's got a lot to do with it. I'm not going to get into it . . . If you hire her, I'm quitting. I won't help you anymore . . . *Every day that she works, I will send [friend A] or myself to come down there and kick her ass . . . And you know the damage we can do before the sheriff's office get there*.

(Emphasis added). *Id.* at 22. When the bar owner chastised Respondent for making these threats, she replied by saying he was "a horrible bar owner" and then "went on and on just said that every time [Petitioner] worked, that I would have a problem." *Id.*

{¶9} The bar owner also noticed Respondent made a Facebook post about the situation. Respondent admitted she made the following post:

> People have lost their ever loving mind if they think it's a good idea to try to get a job where I hang out at and help out at all the time. When said person wants to fuck with me and my family. Have you timed how long it takes for the SO to respond there? I'm not sure if you think you're being cute but I will reassure you that until you have fucked with a true Baronian you have no idea of how the town will stick together.

*Id.* at 7-8 (Ex. 1).[1] Respondent acknowledged she used "SO" to mean Sheriff's Office and she used the word "people" to mean Petitioner. *Id.* at 8-10.

{¶10} Respondent emphasized she blocked Petitioner from her Facebook access so Petitioner could not directly view Respondent's posts. *Id.* at 67. However, in addition to the bar owner noticing the post, multiple people "liked" the post, and friend A (mentioned in the call to the bar owner) replied by posting a meme.

{¶11} When the bar owner called Petitioner to tell her he could not hire her, Petitioner asked the reason. The bar owner thus told her he did not want anyone getting hurt in his bar while relaying the content of Respondent's threat to Petitioner. He described Petitioner, upon learning this, as extremely concerned, upset, and crying. He said she sounded afraid, and he specified she was crying about the threats, not about the

---

[1] Petitioner assumed Respondent's use of the term "Baronian" was meant to say Bartonian, which she assumed referred to people who grew up in the town Barton. *Id.* at 36.

Case No. 25 BE 0029

job. *Id.* at 22, 24. When Petitioner asked what she should do, he told her, "if I were you and knowing [Respondent], I would go and get a protection order." *Id.* at 23.

**{¶12}** The bar owner confirmed he had been a friend of Respondent for a long time but said, "sometimes the hardest thing to do is the right thing." *Id.* at 24. After Petitioner filed for a protection order, Respondent texted the bar owner to say she quit; her stepdaughter quit shortly thereafter. *Id.* at 23. The bar owner then hired Petitioner. *Id.* at 26.

**{¶13}** They learned Respondent began making critical posts on certain nights about coming to the bar; the bar owner noted the posts always seemed to be when petitioner was scheduled to work, as if Respondent acquired the schedule. *Id.* at 25, 38. For instance, one sequence of posts commenced when friend A dropped a pin on a map of the bar's location along with the name of the bar and said, "Gonna check out the bad service." When a commenter replied by asking whether friend A was working, Respondent commented, "they don't like our kind there working." *Id.* at 13-14, 74 (Exhibit 3, partially admitted by the trial court as to Respondent's comment and posts giving her comment context). Respondent testified "our kind" meant herself. *Id.* at 15.

**{¶14}** Respondent testified she placed the call with the bar owner on speakerphone while on the porch of the bar with others present, including her step-daughter (who was working at the bar at the time), her daughter (who was on the phone with someone else at the time), two customers, and a cook. *Id.* at 18-19. Respondent testified, "what I said was if she was hired there that I would come down there, sit there, *and cause a scene every single time*." (Emphasis added.) *Id.* at 17.

**{¶15}** She said this was not a threat of bodily harm and claimed she did not threaten to "kick [Petitioner's] ass" while theorizing the bar owner was lying because he wanted to date Petitioner. *Id.* at 17-18. Both the bar owner and Petitioner testified they were not romantically involved. *Id.* at 26, 33.

**{¶16}** Respondent's stepdaughter (the daughter of Respondent's current husband) testified she was the one who told Respondent about the bar owner potentially hiring Petitioner. She said she heard "the majority" of the phone call while she was working but sitting on the porch of the bar with Respondent who had the phone on speaker. *Id.* at 51-52, 54. According to the stepdaughter's testimony, Respondent told

the bar owner that hiring Petitioner "was going to cause a lot of problems" and "was going to cause a confrontation" due to the "situation with her ex-husband and just that it wasn't very fair." *Id.* at 53. The stepdaughter said she did not hear threats or a reference to the sheriff's office in the call; however, she also noted she did not hear the "very end" as she left to wait on a customer; she also said she only remembered "bits and pieces" as it was weeks ago. *Id.* at 52-56.

{¶17} Respondent's daughter (Petitioner's stepdaughter) then testified about being on the phone with her boyfriend while also listening to Respondent's phone call with the bar owner. *Id.* at 61-62. She acknowledged hearing Respondent tell the bar owner she "would cause a scene that like sheriffs would have to come" but opined this was not a threat against anyone. *Id.* at 63. She said Respondent was "[n]ot really yelling" when complaining to the bar owner, "everything she's doing to my children's dad . . . You're betraying me." *Id.* at 63-64. The daughter also acknowledged she heard Respondent mention friend A but believed this merely referred to how none of them would patronize the bar if he hired Petitioner. *Id.* at 64.

{¶18} Petitioner testified one reason she filed the petition for a protection order was because the words Respondent spoke to the bar owner constituted threats to physically harm her whenever she was at work. She explained, "So at that point I felt anywhere I would be she would be wanting to harm me." In addition, Petitioner said the social media posts made her fearful, afraid, and upset. *Id.* at 32. She testified to her belief that the question Respondent posed about how long it would take the sheriff's office to arrive at the bar was a threat of physical harm. *Id.* at 33.

{¶19} Petitioner said she was also "absolutely" afraid of friend A, who was Respondent's best friend mentioned in the phone call to the bar owner. *Id.* at 36. Petitioner called the sheriff's office after hearing from the bar owner. She testified, just as the bar owner recommended, the sheriff's office also advised her to get a protection order from the court when it opened the next week. *Id.* at 34, 37.

{¶20} In explaining her fear of imminent physical harm, she noted Respondent "likes to brag about beating people up" (including the first wife of Petitioner's husband). *Id.* at 37. Petitioner testified that due to Respondent's conduct, she has attempted to avoid Respondent by not going "anywhere" in town besides her regular day job (where

she works from home or the home of her boss) and the new bartending position (her second job). *Id.* at 34-35. She indicated she spends time with her mother (at her mother's house, shopping, or at Bingo) to avoid Respondent, to get out of the house she is still sharing with her husband, and to provide companionship because her father recently died. *Id.* at 35, 39, 46-48. Petitioner said she switched stores, traveling to a store 15 minutes past her mother's house, which she said was not convenient but helped her avoid Respondent. *Id.* at 35. She also said she installed additional house cameras after the threats. *Id.* at 36-36, 44.

**{¶21}** Petitioner noted she started counseling in January 2025, prior to the threats, because she was struggling with whether to end her marriage after discovering her husband's affair. However, she also testified to attending extra counseling sessions due to Respondent's conduct. *Id.* at 43-45. She said she "needed a mental day" and missed a day of work after the threats. *Id.* at 44.

**{¶22}** In announcing the protection order would be issued, the court found sufficient evidence of two or more incidents of conduct by Respondent closely related in time that threatened Petitioner, causing her to "anticipate immediate and present danger." The court described the incidents as "outrageous, to say the least." *Id.* at 79. The court opined the record clearly showed Petitioner genuinely fears Respondent will cause her physical harm, noting "I don't know how else you interpret" the comments about coming to the bar to "kick her ass" and about how long it would take the sheriff's office to arrive. *Id.* at 79-80. The court reiterated, "I don't know how else you can put those two things together and not think that you would not [sic] cause somebody to fear you're going to cause them harm or cause them mental distress." The court also opined there was "ample evidence" establishing mental distress. *Id.* at 79. The court indicated the bar owner's testimony was credible. *Id.* at 80. After hearing arguments on the order's duration, the court chose five years, as requested by Petitioner, but announced the intent to retain jurisdiction to modify the duration. *Id.* at 81.

**{¶23}** On June 9, 2025, the court issued the protection order finding by a preponderance of the evidence Respondent knowingly engaged in a pattern of conduct that caused Petitioner to believe Respondent "will cause physical harm or cause or has caused mental distress" (and found the terms were equitable, fair, and necessary to

Case No. 25 BE 0029

protect Petitioner from stalking offenses). The court also checked a box (on the form order) finding by clear and convincing evidence Petitioner reasonably believed Respondent's conduct endangered the health, welfare or safety of Petitioner or a family or household member and presented a continuing danger to Petitioner or a family or household member (and found the terms were equitable, fair, and necessary to protect Petitioner from continuing danger).

{¶24} Among other terms, Respondent was barred from contacting Petitioner, being within 500 feet of Petitioner, or entering the grounds of her residence or place of employment. (No firearm restriction was imposed.) The court made the order effective until June 5, 2030 (five years from the hearing date) while retaining jurisdiction to amend the duration. (6/9/25 J.E. 1); (6/9/25 J.E. 2, Order of Protection).

{¶25} Respondent filed a timely notice of appeal. Respondent sets forth four assignments of error on appeal: each of the first three assignments of error challenge an element from the underlying statute and the fourth assignment of error challenges the duration. There is no appellee's brief.

ASSIGNMENTS OF ERROR ONE–THREE: ELEMENTS

{¶26} In challenging the trial court's decision finding Petitioner proved the elements of menacing by stalking, Respondent sets forth the following assignments of error on that subject:

> "THE TRIAL COURT ERRED IN GRANTING APPELLEE'S PETITION FOR A CIVIL STALKING PROTECTION ORDER, AS APPELLEE DID NOT PRESENT SUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT APPELLANT ENGAGED IN ACTS OR A PATTERN OF CONDUCT OF MENACING BY STALKING."

> "THE TRIAL COURT ERRED BY FINDING THAT APPELLANT KNOWINGLY CAUSED APPELLEE TO BELIEVE THAT THE OFFENDER WILL CAUSE PHYSICAL HARM TO HER."

> "THE TRIAL COURT ERRED BY FINDING THAT APPELLANT KNOWINGLY CAUSED MENTAL DISTRESS TO THE APPELLEE."

{¶27} A petitioner can request a civil stalking protection order by alleging an adult respondent engaged in a violation of R.C. 2903.211 against the person to be protected

by the order. R.C. 2903.214(C)(1). The statute cited therein defines the offense of menacing by stalking. R.C. 2903.211(B). The menacing by stalking statute initially provides:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

R.C. 2903.211(A)(1).

**{¶28}** "In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person . . . or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a[n] . . . organization that employs the other person." *Id.* The menacing by stalking statute also prohibits using any written communication or electronic method of transmitting information to post a message with purpose to violate (A)(1) or with purpose to incite another to do so. R.C. 2903.211(A)(2) (including via computer or telecommunications device), (D)(6), citing R.C. 2913.01 (defining devices and systems).

**{¶29}** "[W]hen granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence" the required elements. *Felton v. Felton*, 79 Ohio St.3d 34, 42 (1997) (where the elements involved whether the petitioner or her family or household members were in danger of domestic violence), applying R.C. 3113.31(D) (a similar domestic violence protection order statute, which says to proceed as in a normal civil action); *see also* R.C. 2903.214 (D)(2) (schedule a full hearing after the ex parte order), (3) (if no ex parte order, "proceed as in a normal civil action and grant a full hearing on the matter"), (E)(1)(b) (specifying the clear and convincing evidence standard of proof only for the electronic monitoring option), (G)(1) (applying the Rules of Civil Procedure to the full hearing).

**{¶30}** A preponderance of the evidence is defined as the greater weight of the evidence or evidence that leads the trier of fact to find the existence of a contested fact is more probable than its nonexistence. *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

Case No. 25 BE 0029

"The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Id.*, quoting *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261 (1928). As the preponderance of the evidence standard is less than clear and convincing evidence, there is no requirement to produce a "firm belief" in the mind of the trier of fact. *See Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). And, of course, the relevant preponderance of the evidence standard is much less than the beyond a reasonable doubt standard, which would be the required standard of proof for a criminal charge of menacing by stalking. *See id.*

**{¶31}** Respondent's arguments on the elements of menacing by stalking are comprised of challenges to both the sufficiency and the weight of the evidence. *See generally Felton* at 43 (where the Supreme Court concluded, "our review of the record shows sufficient, credible evidence to support" the required elements). Subsequently to cases such as *Felton*, the Ohio Supreme Court confirmed how weight and sufficiency are distinct concepts in civil law, just as they are distinct concepts in criminal law. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 9-10, 15-17, 23 (noting the term "some competent, credible evidence" was misinterpreted as a merger of the concepts); *see also State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997) (sufficiency of the evidence and weight of the evidence are distinct concepts with different tests).

**{¶32}** Accordingly, the same sufficiency test from criminal precedent applies to a civil case, with adjustment for the standard of proof. *Eastley* at ¶ 19, 23. Whether the evidence is legally sufficient to sustain a judgment is a question of law dealing with adequacy. *Id.* at ¶ 11, citing *Thompkins* at 386. Sufficient evidence exists if, after construing all evidence and inferences in the light most favorable to the petitioner, *any* rational trier of fact could find the elements by the requisite standard of proof. *State v. Goff*, 82 Ohio St.3d 123, 138 (1998) (sufficiency); *State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (reasonable inferences are part of sufficiency); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecuting party, including reasonable inferences, to ascertain if *any* rational trier of fact could find the elements established). Notably, circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

{¶33} A sufficiency analysis does not involve an evaluation of witness credibility, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). In accordance, it has been observed that sufficiency involves the prosecuting party's burden of production on the elements, rather than the burden of persuasion, which is pertinent when evaluating the weight of the evidence. *Thompkins* at 390 (Cook, J., concurring).

{¶34} Distinctly, weight of the evidence concerns "the effect of the evidence in inducing belief" with the corresponding review evaluating "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Eastley* at ¶ 12, quoting *Thompkins* at 387. When a party argues a judgment is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence including reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387.

{¶35} The appellate court's discretionary power to grant a new trial on manifest weight grounds is limited to the "exceptional" case, one where the evidence weighs "heavily" against a finding of guilt. *Id.* "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is because the trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶36} First, Respondent focuses on the "pattern of conduct" element of menacing by stalking within R.C. 2901.211(A)(1) ("by engaging in a pattern of conduct shall

knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person"). Criticizing the trial court's interpretation of her Facebook post in Exhibit 1 (about how long it takes the sheriff's office to respond to a call at the bar, which we analyze further below), Respondent concludes this should not be considered an "incident" for the pattern of conduct element. She then criticizes the trial court's conclusion regarding her phone call to the bar owner (which we also analyze further below), and she likewise concludes this should not be considered an incident for the pattern of conduct element.

{¶37} The menacing by stalking statute defines "pattern of conduct" as including "two or more actions or incidents closely related in time" (regardless of whether there has been a prior conviction based on any of those actions or incidents). R.C. 2903.211(D)(1). The Ohio Supreme Court has explained: "In determining what constitutes a 'pattern of conduct,' the court must consider all actions or incidents, even if some of them, when viewed in isolation, do not seem threatening." *State v. Crawl*, 2025-Ohio-2799, ¶ 15; *see also Miller v. Leone*, 2024-Ohio-1325, ¶ 13, 29 (7th Dist.) (in discussing the physical harm option, we pointed out a pattern of conduct may be shown with examples of statements that could be interpreted as physical threats taking into consideration all circumstances, regardless of whether an act, in isolation, does not appear particularly threatening).

{¶38} Accordingly, each incident need not be independently exchangeable with the "pattern of conduct" element in the menacing by stalking statute. *See Crawl* at ¶ 15-16. In other words, the test is not whether Respondent's posting of the social media message in Exhibit 1 itself and whether Respondent's call to the bar owner itself *each independently showed* Respondent knowingly *caused Petitioner to believe* she will cause her (or another relevant person) physical harm or mental distress.

{¶39} Regardless, as further explained below, the two incidents each independently satisfied the other elements even under Respondent's view of the analysis. Furthermore, other relevant evidence was presented on more than the two incidents reviewed by Respondent, which also provide additional context for those two incidents. We incorporate our Statement of the Case above for a detailed recitation of the facts. For instance, Respondent sent the text message in Exhibit 4 to Petitioner, warning her to be

prepared because she soon would be "telling the world what kind of person you really are." She then posted the highly anxiety-inducing disclosure in Exhibit 2 with an incendiary accusation about Petitioner (which according to Petitioner was untrue) in response to another person's social media comment. The friend she mentioned in the phone call to the bar owner posted the comment in Exhibit 3 about going to the named bar to "check out the bad service" with a map containing a pin dropped at the location (which the court found relevant for context), and Respondent joined this online conversation to add a comment about the bar "not liking our kind there working." This indicated Respondent was publicly placing blame on Petitioner for Respondent no longer working at the bar. (It also suggested friend A was on board with helping to distress Petitioner at work just as Respondent warned the bar owner over the phone).

{¶40} All of this evidence can be considered in determining Respondent engaged in a pattern of conduct. Whether the pattern of conduct was instigated by the proper mental state and whether this caused one of the remaining elements are subsequent questions.

{¶41} This leads to Respondent's argument about the evidence presented to establish her mens rea and to establish that her intent was successful. That is, she disputes the evidence showed that by engaging in the pattern of conduct, she *knowingly* and actually caused Petitioner to believe she will cause physical harm or mental distress to Petitioner or a family or household member. She points to her testimony that she blocked Petitioner on Facebook and concludes this precluded her social media comments from knowingly causing harm to Petitioner. As to the phone conversation with the bar owner, she says this was a private conversation with a close friend, not a direct threat voiced to Petitioner.

{¶42} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). As intent dwells in the mind of the defendant, establishing the mens rea revolves around an evaluation of the totality of the surrounding facts and circumstances, and the defendant's mental state can be proven by inference. *Treesh*, 90 Ohio St.3d at 484-485 (direct evidence of a defendant's purposeful intent to

kill is rarely available, but circumstantial evidence inherently possesses the same probative value as direct evidence).

{¶43} A rational person could find Respondent was aware the bar owner would probably tell Petitioner what she said in the phone call. *See* R.C. 2901.22(B). This result was foreseeable, as was Petitioner's reaction. *Crawl*, 2025-Ohio-2799, at ¶ 12. Respondent admitted she knew the bar owner was considering hiring Petitioner who asked him for a job; i.e., she knew he would be contacting Petitioner soon. Predictably, the bar owner did then tell Petitioner what Respondent said in explaining why he decided not to hire her. Moreover, Respondent's own evidence disclosed this phone call was made on speakerphone in a public place with other people present.

{¶44} According to the bar owner's testimony, Respondent told him she would quit if he hired Petitioner and voiced the following threat: "Every day that she works, I will send [friend A] or myself to come down there and kick her ass . . . And you know the damage we can do before the sheriff's office get there." (Tr. 22).

{¶45} In addition, Respondent made a Facebook post about Petitioner trying to get a job at the bar that Respondent was claiming as her territory while opining Respondent intended to "fuck with" Petitioner and threatening Petitioner with the following ominous comments: "Have you timed how long it takes for the SO to respond there? I'm not sure if you think you're being cute but I will reassure you that until you have fucked with a true Baronian you have no idea of how the town will stick together." *Id.* at 7-8. Respondent admitted "SO" meant sheriff's office. Multiple individuals "liked" Respondent's post. Respondent's very words clearly indicate an intent for Petitioner to learn of the threats within the post and to have fear. "Explicit threats are not necessary to establish the elements of menacing by stalking" as pointed out by the Ohio Supreme Court. *Crawl* at ¶ 11, 15, 18.

{¶46} Next, we emphasize Petitioner testified she feared Respondent would physically assault her due to Respondent's conduct and the totality of the circumstances. Combined with the other conduct reviewed above, "some rational person" could find by engaging in a pattern of conduct Respondent acted knowingly to cause Petitioner to believe she would cause her physical harm and did cause Petitioner to believe Respondent would cause her physical harm. *Compare Caban v. Ransome,* 2009-Ohio-

1034, ¶ 18 (7th Dist.) (where there was no testimony the petitioner feared for her physical safety but rather she feared the respondent would keep asking why she ended their long-term relationship, we noted a "threat" to approach a person for conversation is not a threat of physical harm), *abrogated on other grounds by Z.J. v. R.M.*, 2025-Ohio-5662, ¶ 10, 12, 46-47 (where the Ohio Supreme Court found actual mental distress need not be suffered, as discussed further below).  Furthermore, the evidence adequately indicated Petitioner reasonably believed Respondent would physical harm her, and the trial court's weighing of the evidence on reasonableness of her belief was valid and rested within the province of the fact-finder.  (Tr. 79-80); s*ee also Crawl* at ¶ 11.

{¶47} Respondent focuses on mental distress in her third assignment of error; however, if sufficient evidence supports the belief of the physical harm option and the decision is not contrary to the manifest weight of the evidence, then the mental distress option need not be reached.  R.C. 2903.211(A)(1); *see also gener*ally *Z.J.* at ¶ 1-3, 9.  In any event, an alternative decision on the mental distress option was supported by sufficient evidence and was not contrary to the manifest weight of the evidence.

{¶48} The menacing by stalking statute defines mental distress as: "(a) Any mental illness or condition that involves some temporary substantial incapacity; [or] (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services."  R.C. 2903.211(D)(2).  We have explained mental distress is more than mere mental stress or annoyance.  *R.G. v. R.M.*, 2017-Ohio-8918, ¶ 17 (7th Dist.); *Caban* at ¶ 29.

{¶49} A temporary incapacity is substantial if it significantly impacts the person's daily life.  *R.G.* at ¶ 17.  Evidence of changed routine, an inability to sleep, or difficulty concentrating on work are considerations in determining the existence of a temporary substantial incapacity under subdivision (a) or in determining the existence of a mental condition that would normally require mental health services under subdivision (b).  *Id.* Consultation with a physician or mental health provider can be a consideration in evaluating mental distress, although not required.  *Id.*  Moreover, the trier of fact may rely

on personal experience and knowledge to determine the effects of a respondent's conduct. *Id.; Caban* at ¶ 29.

**{¶50}** Notably, in making these statements about mental distress, we were applying now-defunct district precedent that *actual mental distress must have been suffered* by Petitioner. *R.G.* at ¶ 12-15 (contrasting it with the other option: causing Petitioner to believe the offender will cause physical harm in the future); *Caban* at ¶ 23-24 (maintaining prior district law opining "cause another person to believe that the offender will cause" only modified "physical harm" and not "mental distress"), applying *Darling v. Darling*, 2007-Ohio-3151, ¶ 20 (7th Dist.). However, *the Ohio Supreme Court recently held that actual mental distress is not required* under the plain language of the statute. *Z.J.*, 2025-Ohio-5662, at ¶ 18, 31 (in the menacing by stalking statute, "believe" modifies both "physical harm" and "mental distress").

**{¶51}** The Supreme Court specifically abrogated the portion of our decision in *Caban* at ¶ 23-24 on showing of actual mental distress. *Id.* at ¶ 10, 12, 47 (in ruling on a certified conflict). Consequently: "a petitioner need not show that he has suffered actual mental distress—but only a belief that the respondent will cause him mental distress—to obtain a civil stalking protection order." *Id.* at ¶ 46. The trial court's order essentially utilized this principle when finding Respondent "knowingly engaged in a pattern of conduct that caused Petitioner to believe that Respondent *will* cause physical harm or *cause* or has caused *mental distress* . . ." (Emphasis added.) (6/9/25 J.E., Order of Protection).

**{¶52}** Here, the bar owner's testimony described Petitioner as extremely concerned, upset, afraid, and crying about Respondent's threats. When Petitioner despondently asked what she should do, he told her, "if I were you and knowing [Respondent], I would go and get a protection order." *Id.* at 23. Likewise, Petitioner herself testified Respondent's conduct made her fearful, afraid, and upset. *Id.* She called the sheriff's office and was again advised to get a protection order. Petitioner also noted Respondent bragged in the past about beating up a former wife of Petitioner's husband.

**{¶53}** Furthermore, Petitioner testified to attending extra counseling sessions due to Respondent's conduct and missing a day of work due to the threats. Contrary to Respondent's contention, the fact that she began counseling three months before the

threats due to her husband's infidelity does not diminish the testimony that she also used her counselor for sessions related to Respondent's behavior. Moreover, Petitioner testified she has avoided going places locally so as not to run into Respondent. For instance, she switched her shopping to a store requiring her to travel 15 minutes past her mother's house, which she said was not convenient but was carried out in order to avoid Respondent. She also said she installed extra cameras after the threats. Contrary to Respondent's contention, the fact that Petitioner mentioned she was also spending more time with her mother because her father recently died does not take away from her testimony on changed routines.

**{¶54}** Combined with this testimony, the trial court could also consider personal experience and knowledge of ordinary life in making the mental distress determinations from the totality of circumstances surrounding the pattern of conduct and the case as a whole. *See Crawl*, 2025-Ohio-2799, at ¶ 13; *R.G.*, 2017-Ohio-8918, at ¶ 17 (7th Dist.); *Caban*, 2009-Ohio-1034, at ¶ 29 (7th Dist.). There was evidence of mental distress.

**{¶55}** Regardless, a rational trier of fact could most certainly conclude Respondent, through her pattern of conduct, knowingly caused Petitioner *to believe Respondent would cause her mental distress*. Again, as declared by the Ohio Supreme Court, a petitioner need only show a belief the respondent will cause her mental distress, not that the respondent already caused her mental distress. *See Z.J.*, 2025-Ohio-5662, at ¶ 46. In accordance, the state presented sufficient evidence of the elements of the offense.

**{¶56}** As for the weight of the evidence, the trial court occupied the best position from which to judge the credibility of the witnesses by viewing their gestures, demeanor, voice inflections, eye movements, and other indicators of truthfulness or untruthfulness. *See Seasons Coal*, 10 Ohio St.3d at 80. After watching Petitioner's testimony, the trial court found her credible. It was the trial court's prerogative to do so and to find Respondent's testimony lacked credibility. *See id.; Hunter*, 2011-Ohio-6524, at ¶ 118 (the weight to be assigned to the evidence and the witnesses' credibility are primarily for the trier of the facts). For instance, the trial court reasonably discounted Respondent's contention that her post about the long response time for the sheriff's office to the bar's

location was not physically threatening but was merely meant to say she would defend herself.

**{¶57}** In addition, the court disbelieved Respondent's claims that she did not say she was "going to kick [Petitioner's] ass" and the bar owner was lying. The court found the bar owner credible, noting he "doesn't have a dog in this fight" and was a friend of Respondent and her family. It was also for the trial court to find the testimony of Respondent's witnesses lacked credibility or to merely take notice that their testimony indicated they did not fully hear every part of Respondent's phone call with the bar owner. Her own witness (her daughter) confirmed she heard Respondent threaten to cause a scene at the bar such that the sheriff's office would have to respond if Petitioner started working there. (Tr. 62-63).

**{¶58}** On a manifest weight review, "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts . . . If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley*, 2012-Ohio-2179, at ¶ 21, quoting *Seasons Coal* at 80, fn. 3. In reviewing the entire record, weighing the evidence including reasonable inferences, and considering the credibility of witnesses, it cannot be said that in resolving conflicts in the evidence, the trial judge clearly lost his way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See Lang*, 2011-Ohio-4215, at ¶ 220. This is not the "exceptional" case where the evidence weighs "heavily" against the trial court's decision. *See id.*

**{¶59}** Contrary to Respondent's first three assignments of error, there was sufficient evidence on the elements of menacing by stalking, and the trial court's decision was not contrary to the manifest weight of the evidence.

ASSIGNMENT OF ERROR FOUR:  DURATION

**{¶60}** Respondent's final assignment of error provides:

"THE TRIAL COURT ABUSED THEIR DISCRETION IN GRANTING THE CIVIL STALKING PROTECTION ORDER FOR FIVE YEARS."

**{¶61}** Five years is the maximum duration for a civil stalking protection. R.C. 2903.214(E)(2)(a), (b) (then renewable in same manner as the original petition). "The

precise standard of review of a protection order on appeal depends upon the challenge being made. "For instance, an abuse of discretion standard of review is employed if the challenge concerns the scope of the order." *Serdy v. Serdy*, 2013-Ohio-5532, ¶ 27 (7th Dist.). As Respondent recognizes: "The duration of a civil stalking protection order is within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the decision was arbitrary, unconscionable or unreasonable." *Taylor v. Taylor*, 2012-Ohio-6190, ¶ 25 (2d Dist.), quoting *Jenkins v. Jenkins*, 2007-Ohio-422, ¶ 10 (10th Dist.) (finding no abuse of discretion where the trial court increased the duration of a magistrate's three-year order to five years).

**{¶62}** In applying the abuse of discretion standard of review, we do not substitute our judgment for that of the trial court unless the decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An unconscionable decision includes one that affronts a sense of decency or justice. *See Hise v. Laiviera*, 2018-Ohio-5399, ¶ 29 (7th Dist.). The Ohio Supreme Court defines an arbitrary decision as one made without consideration of the facts or circumstances. *State v. Beasley*, 2018-Ohio-16, ¶ 12. "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAA Ents. Inc. v. River Place Community Urban Redevelopment. Corp.*, 50 Ohio St.3d 157, 161 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

**{¶63}** At the protection order hearing, after announcing the order of protection would be granted, the trial court asked for arguments about the order's duration. Petitioner requested five years. (Tr. 80). In response, Respondent's attorney opined five years "was way over the top for this" and asserted Respondent's conduct was related to Petitioner's divorce from Respondent's ex-husband while estimating those proceedings should be over in a year. Petitioner's attorney replied by noting the divorce could actually take two years (and thus, if the defense was successful in obtaining a duration in line with the divorce, two years would seem more appropriate). The trial court indicated difficulty understanding Respondent's argument that Petitioner's marital situation should correspond to the duration of the order binding Respondent and rejected the argument. The court chose a duration of five years and specifically pointed out it was retaining

Case No. 25 BE 0029

jurisdiction to modify the duration. *Id.* at 81; (6/9/25 J.E. 1 & 2); *see also* R.C. 2903.214(J)(1)-(2) (speaking of costs in connection with filing the protection order as well as in connection with modification, dismissal, or withdrawal of it).

{¶64} Alleging the trial court's decision on the duration was arbitrary, Respondent claims the trial court simply chose five years because this is what Petitioner requested. However, the trial court listened to the arguments on duration and clearly considered the facts and circumstances of the case before it. *Compare Beasley*, 2018-Ohio-16, at ¶ 12-13 (where the Supreme Court found a trial court's announcement of a blanket policy was arbitrary as the trial court essentially admitted there was no regard for the facts and circumstances of the case). As expected, the trial court considered what both sides were requesting and used the evidence it just heard and summarized to make its decision on the appropriate length of the order's effectiveness.

{¶65} Alleging the trial court's decision on the order's five-year duration was unreasonable, Respondent describes the facts of this case as "incredibly mild" compared to more extreme cases. We note the duration of a protection order is not necessarily akin to a criminal sentence where a punishment is often expected to correspond to the severity of the threatened harm. For instance, the duration may rationally correspond to a respondent's perceived persistent or irrationality. Also, the parties are grown adults (with adult children), as opposed to a situation involving a teenage or young adult making poor choices in their early development of maturity and control. In any event, it would fall within the trial court's discretion to disagree with the characterization of the facts as mild; the court opined the facts were quite outrageous. We note to "kick [a victim's] ass" can result in serious physical harm in many cases.

{¶66} Respondent concludes one or two years would be more reasonable, again connecting her conduct to Petitioner's divorce and predicting the tension between Petitioner and Respondent will be over when Petitioner's divorce is finalized. However, it was within the trial court's discretion to reject the rationale of correlating the duration of the protection order against Respondent to the timeline of the divorce proceedings between Petitioner and Petitioner's husband, who was Respondent's ex-husband. We note Respondent is herself married, and there is no indication this was some type of competition for Petitioner's husband.

**{¶67}** Although the duration is lengthy, we cannot say "there is no sound reasoning that would support that decision." *AAA Ents.,* 50 Ohio St.3d at 161 (defining unreasonable aspect of abuse of discretion). "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*; *see also Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990) (when applying the abuse of discretion standard, "an appellate court is not free to substitute its judgment for that of the trial judge"). This assignment of error is overruled.

**{¶68}** For the foregoing reasons, Respondent's assignments of error are overruled, and the trial court's judgment granting the civil stalking protection order is affirmed.


Waite, P.J., concurs.

Dickey , J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs to be taxed against the Respondent-Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**