[Cite as *Napier v. Kelley*, 2026-Ohio-1700.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| NIKKI NAPIER, | : | |
| Appellee, | : | CASE NO. CA2025-10-082 |
| vs. | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>5/11/2026 |
| SHANE KELLEY, | : | |
| Appellant. | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2025 DRH 00923

Nikki Napier, pro se.

Angela J. Glaser, for appellant.

# **O P I N I O N**

**SIEBERT, J.**

{¶ 1} Shane Kelley appeals the trial court's granting of a five-year domestic violence civil protection order in favor of Nikki Napier which also covered her and Kelley's shared child, Adam,[1] Napier's husband, and their child. Kelley argues issuance of the

---

1. "Adam" is a pseudonym adopted for this opinion for the purposes of the child's privacy. *See State v. Cansler*, 2025-Ohio-2558, ¶ 1, fn. 1 (12th Dist.); Supreme Court of Ohio Writing Manual 115 (3rd Ed. 2024). This opinion uses pseudonyms for all children referenced.

DVCPO was against the manifest weight of the evidence, that it should not also apply to Adam, and that its five-year term is excessive.[2] Upon review, we conclude the manifest weight of the evidence demonstrates that Kelley threatened Napier via social media posts that contained incendiary language and a firearm. These threats justified the issuance of a DVCPO in Napier's favor. However, there is no evidence in the record that Kelley threatened Adam in these posts, meaning the court erred by including him in the order. Finally, the trial court abused its discretion by providing no reasoning for the DVCPO's five-year duration.

**Background**

{¶ 2} Napier and Kelley were previously in a relationship, though they never married. They had one child together, Adam. Napier and Kelley separated around the time Adam turned one. The parties eventually developed a shared parenting plan. In 2024, however, a dispute over the shared parenting plan arose. After a trial, a magistrate terminated the shared parenting plan but left an even parenting time split. Kelley filed objections to the magistrate's decision. On August 27, 2025, after the magistrate's decision but before the hearing on Kelley's objections, Kelley made several social media posts beginning around 3:30 PM. Napier presented Kelley's posts as evidence at the subsequent DVCPO hearing via phone screen shots.[3]

{¶ 3} In the first, longest post, Kelley bluntly voiced displeasure with the magistrate's decision. He accused the magistrate and others of being involved in a

---

2. Kelley does not argue on appeal that the DVCPO's inclusion of Napier's husband and their child was improper.

3. From the exhibits, it appears Napier took the screenshots of the posts at two different times, and there is no time stamp as to when exactly the posts were made. Our description of these posts is in the same order they are presented in the exhibits.

pedophilia ring and other crimes. Kelley also accused the magistrate of ignoring various instances of abuse Adam purportedly received while in Napier's care, including second degree burns, which Kelley posted pictures of. The post referred to Napier several times, though not by name. Among other statements, Kelley stated "[Adam] gets second degree burns at his mother's house and she does not take him to the hospital, I have to when hes [sic] back on my time and the psycho mother tries to say its [sic] my fault he was burned on her time." The post warned "[o]ne more court date. Unfuck it [sic] or everyone will know the truth" about the magistrate's and other's purported crimes. It concluded, "[I]egal or not, [the] government overreach will be answered."

{¶ 4}   Kelley commented on this post twice. The first comment contained a picture of an assault rifle in the passenger seat of his car. The picture was prefaced by the words "May god have mercy, I want justice."



Shane Kelley
May god have mercy, I want justice.

{¶ 5}   In the second comment, Kelley asserted that despite the alleged abuse to Adam, nothing was being done. Kelley further stated, "I'm the government now, you know me as God."



**Shane Kelley**

Child Protection Awareness my child is physically and emotionally scarred for life. Youre doing nothing. Peep picture. Im the government now, you know me as God.

#GOVERNMENTTRAINED

{¶ 6} In the second post, Kelley stated (among other things) he had to go to "war with mothers and magistrates and the government" and that they "have always been the problem."



**Shane Kelley**
1h · 

I honestly want my son to know me for who I am, not for the dad who has to go to war with mothers and magistrates and government.

Women and government have always been the problem.

Prove me wrong. Ill wait until swat shows up.

{¶ 7} The third post is the only one that referenced Napier by name, and Kelley referred to her as the "antichrist" utilizing the "3 branch government" against him. Kelley further stated that he was "ok with where [he was headed]" and "where [he was] at with god." Kelley declared he "follow[s] a different set of rules that the Government tries to shut down" and that God "[gave him] strength though [his] sword."



**Shane Kelley**
1h · 

I guess I need to say, its ok. Im ok with where im headed. Im ok with where im at with god. Im ok with whats going to happen next. If I told you god gave me a plan youd think im crazy and scream spherical earth. Thats ok too. You'll re do this until you get it right. Im not here to save the world, im not Jesus nor the antichrist. **The antichrist is Nikki Napier.** She has a 3 branch government behind her for child abuse, pedophilia, underage consumption and evergreen Containers. This post alone will make Hillary Clinton suck her ▮▮. Its crazy though because im still here. So help me god. I follow a different set of rules that the government tries to shut down. God is my savior and he gives me the strength through my sword.

(Emphasis in original).[4]

{¶ 8}  The fourth and fifth posts state that that an unspecified person's (or persons') actions were "going to cost you one way or another" and that "[w]ar is waged."



**Shane Kelley**
5m · 

# I can be silenced, dont worry, its just going to cost you one way or another



**Shane Kelley**
6m · 

My profile picture screams im a narcissist asshole and my wife sleeps with children▮▮▮▮▮

Lets fucking go chat. War is waged.

{¶ 9}  The final written post Napier presented to the magistrate can speak for itself:

---

4 The highlighted emphasis was presumably made by Napier on the paper copy exhibit.



**Shane Kelley**
19m · 👥

The United States Government trained me to kill for $17/ hour... imagine if they paid me per body...

Napier did not initially see the posts but testified she later "received multiple text messages from other people informing" her of them. After reviewing the posts, Napier went "to the police station to provide them the evidence that [she] had at the time because [she] was absolutely terrified that something was going to happen." According to Napier, Kelley lived three minutes from her house by car.

{¶ 10} Officers subsequently went to Kelley's house but were unable to make contact with him. Shortly after this, Kelley posted a video of himself, clothed in army fatigues and with a rifle slung across his chest. He stated, "So apparently the executive branch of the United States Government wants to show up at my door. Unfortunately, I wasn't here to answer it. If anyone has a fucking problem with the fucking truth, I'm home baby." Kelley then cheekily stuck his tongue out and gave a "hang loose" gesture before he glowered at the camera and said, "I'm fucking home. Bring it."

{¶ 11} Napier filed for a DVCPO the day after Kelley's posts. A magistrate granted an ex parte DVCPO and set the matter for a full hearing. At the full hearing, Napier testified about her fears and concerns following these posts. She commented that it "it just [felt] as though [Kelley] [was] kind of desperate . . . that he [was] not going to win the child custody case" and that she was "not sure what he [would] do" to prevent her from gaining residential custody of Adam. On cross-examination, Napier stated she believed that Kelley's posts constituted a threat against her, saying in part, "[Kelley] said that he wanted justice and posted a semi-automatic weapon. I don't know how much more threatening you can be."

{¶ 12} Both Napier and Kelley's trial counsel indicated that Kelley was arrested after making the social media posts. Napier requested the court issue a protection order "for as long as a year" after Kelley was released from incarceration. However, Napier was unsure of how long Kelley would be incarcerated, and the record is unclear in this regard as well (this will be discussed further below). When asked why she also applied for her husband and both of her children (including Adam) to be added to the DVCPO, Napier stated "I do feel that if [Kelley] for some reason is not able to get to me, that he would do anything to hurt me in any way possible, meaning my children, [and] my husband. Because we do live in such close proximity . . . it would be best if, if my entire household and family are under the protection order, just to make sure they're protected as well."

{¶ 13} Kelley, represented by counsel, presented no evidence at the hearing, and argued that he was "entitled to his First Amendment rights to express his displeasure at anybody in social media." Kelley argued he did not threaten anyone and that his reference to "seeking justice" was a reference to seeking justice in the courts. At the end of the hearing, the court stated, "[Kelly's counsel says] there is no threat but holding a semi-automatic weapon is an implicit threat. And [Napier's] specifically named. So, I'm going to grant the civil protective order and it will be in effect for five years. I believe that's the maximum."

{¶ 14} The court entered the DVCPO on September 12, 2025. The findings of fact simply stated, "[Kelley] made implicit threats brandishing a semiautomatic weapon on social media against [Napier]. [Napier] fears for the safety of herself and everyone in her household due to [Kelley's] hostility." Among other terms, the order prohibited Kelley from approaching or contacting Napier and her family (including Adam) and from possessing firearms. The order stated it would be effective until September 12, 2030.

{¶ 15} Kelley now appeals.

**Applicable Law**

{¶ 16} "[C]ivil protection orders are intended to prevent violence before it happens . . ." *Young v. Young*, 2006-Ohio-978, ¶ 105 (2nd Dist.). To obtain a DVCPO, "the petitioner must prove by a preponderance of the evidence that the respondent has engaged in an act of domestic violence against petitioner, petitioner's family, or petitioner's household members." *McBride v. McBride*, 2012-Ohio-2146, ¶ 12 (12th Dist.). We have previously defined "preponderance of the evidence" to mean, "the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of the contested fact is more probable than its nonexistence." *McGrady v. Muench*, 2019-Ohio-2677, ¶ 12 (12th Dist.).

{¶ 17} For purposes of this case, domestic violence occurs where one places another person "by the threat of force in fear of imminent serious physical harm . . ." R.C. 3113.31 (A)(1)(a)(ii).[5] Threats of force constitute domestic violence when there is fear from a threat that is deemed reasonable after considering the history of the parties. *Halcomb v. Greenwood*, 2019-Ohio-194, ¶ 5 (12th Dist.). This reasonableness must be examined subjectively and objectively. *Fleckner v. Fleckner*, 2008-Ohio-4000, ¶ 20 (10th Dist.). *See also Martinez v. Martinez,* 2023-Ohio-4783, ¶ 19 (12th Dist.). The subjective test "inquires whether the respondent's threat of force actually caused the petitioner to fear imminent serious physical harm, and [the] objective test . . . inquires whether the petitioner's fear is reasonable under the circumstances (that is, whether the respondent's threat would cause a reasonable person to fear imminent . . . serious physical harm)." *Id.*

---

5. The statute applies to "family or household members," which includes "[t]he natural parent of any child of whom the respondent is the other natural parent or is the putative other natural parent." R.C. 3113.31(A)(3)(b).

at ¶ 23.

{¶ 18} Imminent means "'ready to take place,' 'near at hand,' 'impending,' 'hanging threateningly over one's head,' or 'menacingly near.'" *Bargar v. Kirby*, 2011-Ohio-4904, ¶ 19 (12th Dist.), quoting *Henry v. Henry*, 2005-Ohio-67, ¶ 19 (4th Dist.). Imminent "does not mean that 'the offender carry out the threat immediately or be in the process of carrying it out.'" *Id.*, quoting *Henry* at ¶ 19. Generalized or conditional threats (especially "impossibly conditioned" threats), typically do not fulfill this standard. *Id.* at ¶ 21 (holding the "look" of the defendant's face and alleged statement that he would "whip [his former girlfriend's] ass" if she were a man could not reasonably place her in fear of imminent serious physical harm).

{¶ 19} Under Ohio law, "[a]ny protection order issued . . . shall be valid until a date certain, but not later than five years from the date of its issuance" unless otherwise modified or terminated. R.C. 3113.31(E)(3)(a). Ultimately, Ohio law "'expressly authorizes the courts to craft protection orders that are tailored to the particular circumstances'" of a case. *McBride*, 2012-Ohio-2146 at ¶ 8 (12th Dist.), quoting *Abuhamda–Sliman v. Sliman*, 2005-Ohio-2836, ¶ 8 (8th Dist.).

### Standard of Review

*Issuance of DVCPO*

{¶ 20} "[A] dispute regarding whether a protection order should have been granted at all will be reviewed as to whether the issuance was against the manifest weight of the evidence." *Id.* at ¶ 10. A manifest weight of the evidence determination must examine "'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, (1997), quoting *Black's Law Dictionary* (6th Ed.1990). In the context of domestic

violence proceedings, "our review consists [of] reviewing the record and determining whether there is sufficient, credible evidence to prove by a preponderance of the evidence that appellant engaged in any act of domestic violence." *Ferris v. Ferris*, 2006-Ohio-878, ¶ 27 (12th Dist.). *See also McBride* at ¶ 25. "[A] reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered." *Halcomb*, 2019-Ohio-194 at ¶ 36 (12th Dist.).

*Scope of DVCPO*

{¶ 21} We review the scope of a DVCPO, including its time span, under an abuse of discretion standard. *McBride*, 2012-Ohio-2146, at ¶ 10 (12th Dist.). The trial court abuses its discretion if its decision was "unreasonable, arbitrary, or unconscionable." *Ostigny v. Brubaker*, 2024-Ohio-384, ¶ 20 (12th Dist.). "When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court." *State v. Williams*, 2021-Ohio-2717, ¶ 11 (12th Dist.).

**Analysis**

*First Assignment of Error – Issuance of the DVCPO and Inclusion of Adam*

{¶ 22} Kelley asserts on appeal that while "there is no dispute that Mr. Kelley posted comments on Facebook expressing his frustration" with the magistrate's decision to terminate the parties' shared parenting plan, those posts "were not communicated to Ms. Napier [and] do not constitute domestic violence." We disagree.

{¶ 23} We note at the onset that both parties ask this court to take notice of other legal proceedings involving Kelley. Napier's original petition cited a domestic violence case, and her appellate briefing seeks to provide details on it. Kelley's briefing, in turn,

asks this court to take notice of criminal proceedings that occurred after Kelley's posts and arrest. However, "a bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial." *Morgan v. Eads*, 2004-Ohio-6110, ¶ 13. *See also State ex rel. Watkins v. McNamara*, 2025-Ohio-979, ¶ 7. None of the details of either of these cases were part of the record when the magistrate made its decision, and we therefore will not consider them here.

{¶ 24} Upon review of the record, we conclude that issuance of a DVCPO was not against the manifest weight of the evidence. Napier expressly testified to her subjective fear after seeing the posts, stating that she was "absolutely terrified" by Kelley's stated desire for "justice," his reference to her as the antichrist, and posting a picture of a semi-automatic weapon. This fear immediately compelled her to report the posts to the police, who then responded to Kelley's home.

{¶ 25} Kelley argues Napier's fear of *imminent* harm is undermined by her statement that she was "not sure what [Kelley would] do" to prevent her from having custody of Adam. But this statement, when viewed within the context of their bitter custody struggle over Adam, is not a statement of generalized fear of Kelley, but an assertion that she was unsure of what lengths an increasingly "desperate" Kelley would go to prevent her from gaining residential custody of Adam. Kelley's posts contained images of his assault rifle, rattled off serious allegations of child abuse against government officials and Napier, declared "women and government have always been the problem," called Napier the "antichrist," called for "justice" and "war," twistedly mused over how much money he could make if he were "paid . . . per body," and told officers in a video to "bring it" while wearing military fatigues and a firearm across his chest. Though only one of these posts referenced Napier by name, these posts were reasonably viewed by Napier as a threat

of imminent serious physical harm from a man who lived just three minutes from her home.

{¶ 26} Nonetheless, Kelley still maintains the posts were merely meant to "express[] outrage over the custody ruling" by the magistrate. Kelley acknowledges the posts contained a photo of his firearm but makes no attempt to explain how such an image could not reasonably be perceived as a threat, especially when accompanied by the provocative and violent language of his posts. He simply asserts "[a]ny perceived threat was . . . directed toward the Magistrate, not Ms. Napier or her family." But Kelley's consistent references to Napier throughout the post, including calling her the "antichrist" and his assertion that she "has a 3 branch government behind her for child abuse" made it reasonable for Napier to believe the posts implied that she was also a target of his "outrage." *See Calzo v. Lynch*, 2012-Ohio-1353, ¶ 48 (5th Dist.) (affirming a DVCPO where "the trial court found Appellant's statement and his angry demeanor while making the statement was an implied threat of domestic violence."). We therefore conclude that the manifest weight of the evidence supported the trial court's determination that Kelley's posts constituted domestic violence against Napier and merited the issuance of a DVCPO.

{¶ 27} All of this being said, we agree with Kelley's contention that "[t]he record is devoid of any evidence supporting a DVCPO as to [Adam]." At the full DVCPO hearing, Napier asked for Adam to be added to the DVCPO because she believed that if Kelley could not get to her, he would target her family. Napier believed adding Adam to the order would act as a safeguard "just to make sure" he was protected as well. But again, there is no evidence Kelley's threats were directed at Adam in any fashion. Indeed, this whole case stems from Kelley's "outrage" over the purported abuse of Adam and Kelley's desire

to hold the perpetrators of such abuse to account. As a result, the trial court erred in including Adam under the DVCPO, regardless of the standard of review applied.

{¶ 28} While the underlying proceedings and the parties' custody dispute are undoubtedly related, it is important to remember that "domestic violence proceedings are not a substitute for child custody proceedings, with the former permitting courts to 'temporarily provide for the care of minor children' while the latter establish more permanent parental custody rights and responsibilities." *Henson v. Robinson*, 2026-Ohio-70, ¶ 16 (12th Dist.), quoting *Couch v. Harrison*, 2001-Ohio-4199, at *7 (12th Dist.). We say this only to reaffirm the distinction between these types of proceedings and not to assert it was Napier's or the trial court's intention to flout it. Ultimately, this case boils down to Kelley's threats against Napier.

{¶ 29} This assignment of error is overruled in part and sustained in part.

*Second Assignment of Error – The DVCPO's Five Year Duration Constitutes an Abuse of Discretion*

{¶ 30} Kelley argues that "five-year DVCPOs are reserved for circumstances involving an immediate and ongoing threat to an individual's physical safety, based on severe and continuing acts of violence or threats." As a result, he contends the trial court abused its discretion by imposing the maximum duration. Again, a trial court abuses its discretion if its decision was "unreasonable, arbitrary, or unconscionable." *Ostigny*, 2024-Ohio-384, at ¶ 20 (12th Dist.).

{¶ 31} While Kelley's briefing cites to various cases in which five-year DVCPOs were upheld, none of them articulate the standard that he posits on appeal. *See e.g. Hyde v. Smith*, 2015-Ohio-1701 (12th Dist.); *McBride*, 2012-Ohio-2146 (12th Dist.). Instead:

> [T]he duration of a protection order is not necessarily akin to
> a criminal sentence where a punishment is often expected to
> correspond to the severity of the threatened harm. For

instance, the duration may rationally correspond to a respondent's perceived persisten[ce] or irrationality . . . [or their] maturity and control.

*D.F. v. Startkey*, 2026-Ohio-1298, ¶ 65 (7th Dist.). As a result, as our sister court recently and aptly observed, it is largely within the trial court's discretion to characterize the facts of a case and tailor a DVCPO to meet the situation. *Id.*

{¶ 32} At the full hearing, Napier asked for the DVCPO to last one year following Kelley's release from incarceration. However, this is the only discussion in the record by the parties or the magistrate on the duration of the order, and as previously discussed, the record before us is unclear as to when Kelley will be released (assuming he is even still incarcerated). At the hearing and in its order, the court gave no reasoning as to why the facts of this case merited a maximum, five-year DVCPO. As we have previously observed, "This court cannot perform a meaningful appellate review of the domestic relations court's decision absent a clear indication of the domestic relations court's underlying reasoning and analysis." *Gerdes v. Gerdes*, 2020-Ohio-3405, ¶ 20 (12th Dist.) (analyzing abuse of discretion concerning divorce decree); see also *Preece v. Stern*, 2009-Ohio-2519, ¶ 14 (12th Dist.) (finding "when that analysis and clear reasoning is absent from the trial court's written opinion, it is impossible to review the decision without supplanting the trial court's judgment with our own").

{¶ 33} There may be many reasons the magistrate opted for a five-year duration for the DVCPO, but we cannot speculate as to what they were. *Gerdes* at ¶ 21. The record in this case is muddled as to Kelley's potential or actual incarceration and other factors which the court might have considered. For example, did the trial court set the DVCPO's term at five years due to the perceived severity of Kelley's actions, the indefiniteness of his incarceration, or both? Given this muddled record and without an articulation of the

reasoning the court used, this court cannot conduct meaningful appellate review of the DVCPO duration. Under such circumstances, we are compelled to remand the case to the trial court to "issue a decision that provides a clear indication of its reasoning . . . so that this court can . . . perform a meaningful appellate review should the need arise." *Id.* at ¶ 22.

{¶ 34}  This assignment of error is sustained.

{¶ 35} Judgment affirmed in part, reversed in part, and remanded for further proceedings.

BYRNE, P.J., and HENDRICKSON, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed in part and reversed in part, and remanded for further proceedings consistent with the above Opinion.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

75% of costs taxed to Appellant and 25% of costs taxed to Appellee.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robert A. Hendrickson, Judge*

*/s/ Melena S. Siebert, Judge*